**HERCULES INCORPORATED,
Petitioner,**

v.

**UTAH STATE TAX COMMISSION,
and Salt Lake County Board of
Equalization, Respondents.**

No. 930526–CA.

Court of Appeals of Utah.

July 6, 1994.

Keith E. Taylor, Kent W. Winterholler (argued), and Richard M. Marsh, Parsons, Behle & Latimer, Salt Lake City, for petitioner.

David E. Yocom, Salt Lake County Atty., Bill Thomas Peters, Sp. Deputy County Atty. (argued), Karl L. Hendrickson, Mary Ellen Sloan, Deputy County Attys., Jan Graham and Brian L. Tarbet, Salt Lake City, for respondents.

Before BENCH, GREENWOOD and JACKSON, JJ.

## OPINION

GREENWOOD, Judge:

Hercules Incorporated (Hercules) seeks review of the Utah State Tax Commission's (Commission) decision regarding Salt Lake County's tax assessment of Hercules's real property as of January 1, 1990. We affirm.

## BACKGROUND

Hercules is a worldwide producer of a wide variety of products. It operates through eight business groups, which in turn operate forty major plants across the United States. One of Hercules's business groups is the Aerospace group which designs and produces aerospace propulsion systems and products and composite structures. Among other products, the Aerospace group designs, develops, and produces various strategic and tactical missiles and missile systems for the United States government. To accomplish this, the Aerospace group operates eleven production facilities in the United States.

One of the eleven production facilities is Bacchus Works (Bacchus) in Utah; it accounts for eighty-three percent of the business conducted by the Aerospace group. Bacchus designs and produces only strategic missiles.[1] Its sole customer for strategic missiles and missile systems production is the United States government.[2] At Bacchus, Hercules produces solid propellant rocket fuel, rocket motors, rocket motor casings, explosives, and composite carbon fibers, and also conducts related research and development.

Bacchus has property and operations in Salt Lake, Davis, and Tooele Counties in Utah. At issue in this case is Bacchus's Salt Lake County property, which consists of four major plants: Plant 1, NIROP, Plant 3, and Bacchus West. Plant 1, the oldest Bacchus facility, consists of approximately 348 buildings containing roughly 963,875 square feet. The buildings in Plant 1 vary in construction dates from as early as 1914 to as recent as 1989. Plant 1 is used as a research and development facility as well as a production facility for small rocket motors.

The NIROP facility has 134 buildings containing about 477,170 square feet. The NIROP buildings were constructed between 1962 and 1988. This facility is used primarily for storage and material preparation for production and manufacturing processes conducted in Plant 1 and Bacchus West.

Plant 3 has thirty buildings covering 458,339 square feet. The average age of the buildings is eleven years. Plant 3 produces carbon fiber and fiber components.

Finally, Bacchus West has roughly fifty-one buildings which contain nearly 467,000 square feet. Hercules constructed Bacchus West primarily between 1985 and 1990. Bacchus West's major processing buildings are interconnected by an elevated haulageway and a ground level tramway used to transport dry ingredients and equipment. Although originally designed to construct and produce space shuttle rocket motors, the Bacchus West facilities have never been used for that purpose due to the Challenger space shuttle disaster. Instead, the Bacchus West facilities have been adapted to produce Delta, Trident D–5, and Titan rocket motors.

Because of the sensitive nature of the work at Bacchus, both in terms of safety and national security, Hercules arranged in 1974 with the Salt Lake County Assessor's Office to annually assess Bacchus's real and personal property using a method unique to Bacchus. The agreement called for the County to initially appraise Hercules in 1975. Thereafter, Hercules agreed to report annually to the County Assessor the cost of additions, and presumably any deletions, to Hercules's real and personal property. The County Assessor then took the reported annual costs and added them to the prior year's assessment to arrive at the current year's assessed value. This arrangement continued uninterrupted, with one exception, until Her-

---

1. The design and production of tactical missiles takes place at other Aerospace group production facilities.

2. For example, Bacchus has designed and produced the Pershing, Peacekeeper, small ICBM, Titan, Delta, and Trident D–5 strategic missiles.

cules contested the County's assessment for the January 1, 1990 lien date.[3]

In July 1990, Salt Lake County (County) sent Hercules the annual assessment for its real property. The assessed value of Hercules's real property and improvements as of the January 1, 1990 lien date was roughly $211 million. Although the County's January 1, 1990 assessment followed an on-site inventory by the County Assessor's office—the first one since 1978—the $211 million assessment was computed similarly to prior years, i.e. by adding historical costs without allowances for depreciation. Hercules disputed the assessed amount of the real property improvements, but not the associated land value, and appealed to the Salt Lake County Board of Equalization (Board). The Board convened a hearing on November 29, 1990 in which it upheld the County's assessment. Thereafter, on April 1, 1991, Hercules filed a Notice of Appeal with the Commission, asserting that the County's assessed value was improper and in excess of the property's fair market value. In May 1991, the Commission conducted a formal hearing that spanned nine days.

At the Commission's formal hearing, both Hercules and the County presented evidence of the fair market value of Hercules's real property and improvements. Both parties agreed that the replacement-cost-new-less-depreciation method (RCNLD) was the ap-propriate procedure for valuing Hercules's real property and improvements. This initial convergence of opinion, however, quickly dissipated as the parties' separate valuations were significantly disparate.[4] To support its position, Hercules retained an appraisal consulting firm, Strategis, to appraise Hercules's real property and improvements. The principal appraiser for Strategis, Mr. Paul Shoup, valued Hercules's real property and improvements, using RCNLD, at approximately $45.5 million. Meanwhile, the County conducted its own appraisal. It asked Mr. Eddie Kent, a commercial appraiser in the Salt Lake County Assessor's Office and one of the two assessors who had been involved in the original $211 million assessment, to perform the appraisal. Mr. Kent's appraisal valued Hercules's real property and improvements, again using RCNLD, at approximately $183 million. The disparity between the two appraisals results principally from the appraisers' computations of economic and functional obsolescence.[5]

On June 10, 1993, the Commission issued its decision and agreed with the parties that the RCNLD method was appropriate and acceptable. The Commission concluded that Hercules had the burden to establish that the fair market value of its real property and improvements was other than the County's original assessment. Determining that the appraisals' by both of Hercules's experts

3. The one exception was in 1978 when the County performed a county-wide reappraisal program that was done by local valuation. Thereafter, the agreement continued on as before, but with the 1978 appraisal figures, rather than 1975's numbers, as a baseline.

4. The disparity between the two appraisals stems from two main items. First, the numbers from each side for functional and economic obsolescence differed dramatically. *See* footnote 5 and accompanying text. Second, the replacement cost numbers used by both parties' experts, while very close on Plant 1, NIROP, and Plant 3, diverge significantly on Bacchus West. As to the Bacchus West facility, Mr. Shoup, testifying for Hercules, felt that many of the costs associated with the construction of that facility should have been categorized as personal, rather than real, property costs. The Commission dismissed Mr. Shoup's reasoning on this issue as "unpersuasive and erroneous."

5. The theory of functional obsolescence is that as income-producing assets age, both physically and technologically, they lose the ability to efficiently produce income. This decline in ability is quantified as functional obsolescence. Theoretically then, an income-producing asset is functionally obsolete to some extent unless it is state-of-the-art.

Similarly, the theory of economic obsolescence (also referred to as external obsolescence) is that the value of an income-producing asset is affected by the marketplace. For example, the value of a factory that produces horse-drawn buggies is arguably less if that factory competes with automobile factories and presumably more if the current mode of transportation is by horse-drawn buggy.

In the present case, Hercules argued before the Commission that the value of Hercules's production facilities declined due to several external and economic factors such as the space shuttle disaster, the fall of the Berlin Wall, and the various peace treaties signed in the late 1980's that impacted missile production.

were unacceptable, the Commission relied upon the County's appraisal which the Commission found to be "superior to that submitted by [Hercules] by a preponderance of the evidence." Ultimately, the Commission determined that the fair market value of Hercules's property, as of the January 1, 1990 lien date, was Mr. Kent's figure of $183 million, less several adjustments.[6] Hercules now seeks review of the Commission's decision.

## ISSUES

Hercules claims on appeal that the Commission erred by: (1) according the County's proposed value, as represented by Mr. Kent's appraisal, a presumption of correctness, (2) failing to properly account for accumulated depreciation, and (3) revising the original assessed value of Hercules's land.

## STANDARD OF REVIEW

As the Commission conducted a formal adjudicatory hearing in this matter, the relevant standard of review is found in Utah Code Ann. § 59–1–610(1) (Supp.1993). We are to "grant the commission deference concerning its written findings of fact, applying a substantial evidence standard on review," and "grant the commission no deference concerning its conclusions of law, applying a correction of error standard." [7] *Id.* Regarding the substantial evidence standard, this court has previously noted that "[s]ubstantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Orton v. State Tax Comm'n,* 864 P.2d 904, 908 (Utah App.1993) (quoting *Grace Drilling Co. v. Industrial Comm'n,* 776 P.2d 63, 68 (Utah App.1989)). Accordingly, we must uphold the Commission's written findings of fact if they "are supported by substantial evidence based upon the record as a whole." *Zissi v. State Tax Comm'n,* 842 P.2d 848, 852 (Utah 1992).

## ANALYSIS

### Presumption of Correctness

■ Hercules claims that the Commission improperly afforded a presumption of correctness to the County's appraisal. By so doing, Hercules argues, the Commission impermissibly foisted the burden onto Hercules to overcome this presumption of correctness.

■ The Utah Supreme Court has noted that "where the taxpayer claims error, it has an obligation, not only to show substantial error or impropriety in the assessment, but also to provide a sound evidentiary basis upon which the Commission could adopt a lower valuation." *Utah Power & Light Co. v. State Tax Comm'n,* 590 P.2d 332, 335 (Utah 1979); *accord* Utah Code Ann. § 59–1–604 (1992) (stating that burden of proof falls upon party seeking affirmative relief and that burden is satisfied by preponderance of evidence). We believe that *Utah Power & Light* thus stands for the proposition that to prevail in this real property tax dispute, Hercules had to accomplish two things during the formal hearing before the Commission. First, Hercules had to demonstrate that the County's original assessment contained error. Second, Hercules had to provide the Commission with a sound evidentiary basis for reducing the original valuation to the amount Hercules proposed through its appraisal experts.

In the present case, the record shows that Hercules demonstrated error in the County's original assessment but failed to convince the Commission that Hercules's approach provided a sound basis for reducing the assessment. Hercules came to the Commission after the Board had upheld the County's original assessment of $211 million. Accordingly, Hercules had not established either of the requirements from *Utah Power & Light* before the hearing began. During the hearing before the Commission, Hercules successfully met the first requirement by estab-

---

6. The Commission found the value of the property to be $183 million less amounts attributable to the tramway, haulageway, and bridge located at Bacchus West. As the Commission placed no dollar amount on these structures, we refer, for ease of reference, to the $183 million figure.

7. The statute goes on to qualify the standard of review if "there is an explicit grant of discretion contained in a statute at issue before the appellate court." Because no such statute is at issue in this case, we grant no deference to the Commission's legal conclusions.

lishing that the County's original assessment contained no allowance for depreciation and thus overstated the value of Hercules's real property improvements. Despite Hercules's success in highlighting this error, *Utah Power & Light* instructs that Hercules continued to shoulder the burden of providing a sound evidentiary basis to the Commission on which it could reduce the original assessment to the level requested by Hercules.[8]  *See Utah Power & Light,* 590 P.2d at 335.

After Hercules presented its evidence regarding the error of the County's assessment, Hercules and the County presented competing evidence to the Commission in the form of expert testimony. Hercules provided two appraisals, one by Mr. Shoup and the other by Mr. Robert Crawford, an economics professor from Brigham Young University who is not a licensed appraiser. The County produced its own experts: Mr. Eckhardt Prawitt, an appraiser employed by the Utah Association of Counties; Mr. Ted Jones, the chief economist at Texas A & M University's Real Estate Center; and Mr. Kent.[9]

Although the Commission ultimately adopted a position that was closer to Mr. Kent's than to Mr. Shoup's appraisal, it nonetheless weighed and considered the compet-

ing evidence and testimony on both sides. In the end, the Commission concluded that Hercules had not provided a sound evidentiary basis on which the Commission could justifiably reduce Hercules's assessment. At the same time, the Commission did not wholly adopt the County's appraisal, conducted by Mr. Kent. While Mr. Kent's appraisal lowered the original assessment by roughly $28 million, the Commission reduced Mr. Kent's appraisal even further to account for his inclusion of Hercules's tramway, haulageway, and bridge. The fact that the Commission's decision approximated the County's position does not establish that the Commission afforded a presumption of correctness to the appraisal Mr. Kent performed for the County.[10]  Furthermore, even if the Commission had afforded a presumption of correctness to Mr. Kent's appraisal, we believe that such error would have been harmless as the Commission ultimately reached its decision by concluding that Mr. Kent's appraisal was superior to Mr. Shoup's appraisal by a preponderance of the evidence.

### Functional and Economic Obsolescence

■ During the hearing before the Commission, the bulk of the testimony focused on

8. Because Hercules came to the Commission having failed to convince the Board that the County's original assessment contained error, and because the Commission makes one final ruling at the end of a hearing, as opposed to interim rulings during a hearing, the burden placed on Hercules by *Utah Power & Light* persisted throughout the hearing. Furthermore, as the Board had upheld the County's assessment, the Commission properly afforded it a presumption of correctness throughout the hearing. Finally, the Commission's second Conclusion of Law states that "[Hercules] has the burden of proof to establish that the market value of the subject property is other than that as determined by the [County]." We believe this statement clearly shows that the Commission placed the burden on Hercules to overcome the County's original assessment of $211 million rather than the County's subsequent appraisal of $183 million.

9. The Commission chose not to rely on the expert opinions of Mr. Crawford, Mr. Prawitt, and Mr. Jones. Each performed an analysis of Hercules's real property using appraisal or valuation methods other than RCNLD, which the Commission found to be the most appropriate method under the circumstances.

10. Our review of the record reveals only one instance in which a presumption of correctness was raised. After Hercules presented its case to the Commission, Mr. Peters requested the Commission to dismiss the case for failure of proof. During this colloquy, Mr. Peters stated that Hercules "has failed in its proof to overcome, first of all, the presumption of the validity of the initial assessment by the Salt Lake County Assessor's office." Importantly, Mr. Peters was referring to the initial assessment and not to Mr. Kent's subsequent appraisal, which Hercules claims was given a presumption of correctness by the Commission. We believe it was entirely proper for Mr. Peters to raise this issue. Hercules's assessment had been upheld by the Board; accordingly, the initial assessment should have been afforded a presumption of correctness in the hearing before the Commission. However, affording a presumption of validity to the initial assessment is not the same as affording that same presumption to Mr. Kent's subsequent appraisal. We can find no indication in the record before us that the Commission assumed such a posture toward Mr. Kent's appraisal.

the proper amount of functional and economic obsolescence to be allocated to Hercules's real property improvements. On appeal, Hercules asserts that the Commission's decision fails to properly account for these items.

Both Mr. Shoup and Mr. Kent included allowances in their appraisals for functional and economic obsolescence. Their respective allowances, however, differed radically in amount. One of the criticisms the Commission levied against Mr. Shoup's appraisal was that it failed to separate the three distinct components of the depreciation number—physical deterioration,[11] functional obsolescence, and economic obsolescence. Instead, Mr. Shoup computed, using an age life methodology,[12] a lump-sum percentage figure of accrued depreciation for each of the four plants at Hercules: 89% for Plant 1, 78% for NIROP, 56% for Plant 3, and 44% for Bacchus West.

Mr. Kent, on the other hand, computed separate numbers for each of the three component parts of accrued depreciation. He allowed a 5% reduction to Plant 1 and NIROP for functional obsolescence but allowed no reduction to Plant 3 and Bacchus West. Furthermore, he allowed a 10% reduction to all four plants for economic obsolescence. Mr. Kent based these allowances on several items. First, he stated that he utilized replacement, rather than reproduction, costs for the majority of the buildings in Plant 1 and NIROP. Replacement cost assumes that a building of similar utility is constructed rather than an exact replica, thus removing to some extent any functional obsolescence that existed in the old structure. As to Plant 3 and Bacchus West, Mr. Kent gave no

allowance for functional obsolescence. Plant 3, according to Mr. Kent, is a general manufacturing and warehousing area capable of adaptation to general and light manufacturing activities and thus does not suffer from any significant functional obsolescence. In addition, Hercules began construction of Bacchus West in 1985 and admits that it is a state-of-the-art facility. Accordingly, Mr. Kent's opinion was that Bacchus West suffered from no functional obsolescence. Mr. Kent further testified that he based his 10% estimate of economic obsolescence on Hercules's cost, annual, and 10–K[13] reports. These reports, in Mr. Kent's opinion, painted an optimistic picture for the present and future business prospects at Hercules, despite the external economic forces cited by Hercules.

While the concepts of functional and economic obsolescence are easily grasped in a theoretical sense, the task of quantifying the amount of obsolescence appears to be an unpredictable undertaking.[14] The testimony of both Mr. Shoup and Mr. Kent demonstrated that they were, in the end, simply making educated guesses as to the appropriate amounts. In this kind of a case, one longs for clarity and easy computation; however, it simply does not exist. The appraisers' inability to arrive at comparable numbers highlights the difficulty of the task rather than their inadequacy. Accordingly, the Commission was left with two disparate appraisals that contained educated "estimates" of the proper amount of functional and economic obsolescence. We defer to the Commission's determination that the County's appraisal was more credible than Hercules's. Since

---

11. Neither side focused on the physical deterioration component of the depreciation allowance at the hearing. Accordingly, our discussion stresses the other two components—functional and economic obsolescence.

12. Mr. Shoup's method computed two numbers—a numerator and a denominator. The numerator represents the effective age of the real property improvements. This number is an estimate, using the appraiser's best judgment, as to the effective age of the improvements, taking into consideration the improvement's utility and external obsolescence. The denominator represents the economic life of the improvement, which is the appraiser's best judgment as to the

length of time that the improvement will contribute to the value of the property.

13. The Securities and Exchange Commission requires that all businesses which have publicly traded stock file an annual 10–K report. Among other things, the report contains detailed information regarding the business's financial condition.

14. Indeed, the ability to quantify the extent to which the fall of the Berlin Wall has impacted a business (other than a wall-building enterprise) seems a task that would challenge even the famous prognosticator Nostradamus.

the County's appraisal was supported by substantial evidence, it was reasonable for the Commission to accept it. We therefore hold that the Commission did not fail to properly account for functional and economic obsolescence.

### Value of Hercules's Land

■ The Commission made no specific finding or conclusion regarding the value of Hercules's land; however, by adopting Mr. Kent's appraisal, with adjustments, the Commission did uphold the County's revised assessment of Hercules's land.[15] Hercules now complains on appeal that the Commission could not increase the assessed value of the land because Hercules did not dispute the assessment of its real property, only the assessed value of its real property improvements.

In *Kennecott Corp. v. Salt Lake County*, 702 P.2d 451 (Utah 1985), *appeal after remand*, 799 P.2d 1156 (Utah 1990), the Utah Supreme Court noted that a taxpayer who challenges an assessment of tax cannot dictate the scope of the Commission's review. *Id.* at 456; *see also Baker v. State Tax Comm'n*, 520 P.2d 203, 206 (Utah 1974) (noting that Commission is authorized to "cancel, vacate, or change an assessment when, upon a proper showing, it has been determined that the assessment should be so cancelled, vacated, or changed"); *accord* Utah Code Ann. § 59–1–502.5(5) (Supp.1993) (indicating that "commission may ... adjust the assessed valuation of any property").

In the instant case, Hercules claims that the County's original assessment of its real property improvements was incorrect. Such a challenge lays open for review by the Commission, we believe, the County's entire real property assessment of Hercules, which includes both its land and real property improvements. That Hercules has challenged only a portion of the original assessment does not preclude the Commission from reviewing or changing other, unchallenged portions of the County's original assessment.[16] *See Kennecott*, 702 P.2d at 456.

### CONCLUSION

The Commission did not give the County's appraisal a presumption of correctness during the formal hearing. Even if we had decided that it did, any error was harmless. Additionally, the Commission relied on substantial evidence in the record to determine the allowable reductions in value for functional and economic obsolescence. Finally, the Commission is allowed to revise the assessment of Hercules's land, even though Hercules did not initially dispute it, because questioning the veracity of one portion of the County's real property assessment opens up the entire assessment for review by the Commission. Accordingly, we affirm the Commission's decision.

BENCH and JACKSON, JJ., concur.

---

15. The original assessment valued the land at approximately $4.8 million while Mr. Kent's appraisal valued the land at $16 million.

16. We further note that the revised assessment value of Hercules's land was based on Mr. Kent's appraisal work in which he reviewed sales of land parcels comparable to Hercules's land. In the County's original assessment, Mr. Kent's companion assessor, Jona Hansen, testified that she and Mr. Kent originally valued Hercules's land looking at comparable sales of vacant residential parcels, although they did not look at land specifically in the vicinity of Hercules. During his subsequent appraisal, Mr. Kent again valued Hercules's land using a sales comparison method. However, this time he "went out into the marketplace and tried to obtain sales of competing property that would lend themselves to comparability of [Hercules's land]." The Commission apparently felt that this subsequent appraisal by Mr. Kent more closely reflected the value of Hercules's land. We cannot find error in the Commission's decision to adopt Mr. Kent's revised number as he used an accepted appraisal method and seemingly had a legitimate basis for revising the assessed value of Hercules's land.