1999 UT 48

**Jeff and Victoria SCHMIDT, Petitioners,**

v.

**UTAH STATE TAX COMMISSION, County Board of Equalization of Salt Lake County, State of Utah, Respondents.**

No. 970588.

Supreme Court of Utah.

May 14, 1999.

Brian J. Romriell, Steven E. Hugie, Salt Lake City, for petitioners.

Jan Graham, Att'y Gen., John C. McCarrey, Asst. Att'y Gen., Mary Ellen Sloan, Salt Lake City, for respondents.

ZIMMERMAN, Justice:

¶ 1 This matter is before us to review an order of the Utah State Tax Commission ("the Commission") fixing the assessed value on residential property owned by Jeff and Victoria Schmidt and to review the Commission's denial of a request from the Salt Lake County Board of Equalization ("the Board") for reconsideration. Both the Schmidts and the Board challenge the Commission's valuation. The Schmidts argue that their property should be valued at zero due to contamination. The Board argues that the property's value should be higher than that fixed by the Commission. We conclude that neither the Schmidts nor the Board met their burden of showing that the Commission's valuation was not based on substantial evidence, and therefore, we affirm.

¶ 2 The property at issue is residential property located on East Little Cottonwood Road in Sandy, Utah ("the property"). The property consists of a home of approximately 7000 square feet located on 2.7 acres. The property is located at the mouth of Little Cottonwood Canyon near the site where a smelter operated briefly in the early 1870's, refining ore from the mines in the canyon. Tailings from the mill are present on at least some of the land in varying quantities. The Board valued the property at $789,370 for the 1995 tax year. The Schmidts then appealed to the Board to adjust its original valuation and notified the Board of the contamination on the property. An independent

hearing officer for the Board reduced the value of the property to $706,000. The Schmidts then appealed to the Commission.

¶3 The Commission held a formal hearing. The Schmidts argued that because the property was contaminated with high levels of lead and arsenic, the market value should be reduced to zero. In support of their motion, the Schmidts offered letters from the Utah Department of Environmental Quality ("UDEQ") and the United States Environmental Protection Agency ("EPA"). The UDEQ letter states that the three trial holes on the 2.7 acres show that the land contains lead and arsenic at levels well above those UDEQ deems warrant clean-ups or the putting in place of environmental controls. The Schmidts also offered as evidence a letter containing a bid from Sitex Environmental, Inc. ("Sitex"), indicating that the removal of eighteen inches of topsoil from the entire 2.7 acres, disposal of the contaminated soil, and replacement with clean soil would cost $1,042,252.05. The Schmidts submitted an appraisal that valued the property at negative $334,000, a figure reached by deducting the amount of the Sitex bid from the value that the Board had fixed for the property. Finally, the Schmidts relied on letters from several banks that had denied permanent financing for the property after the contamination was discovered.

¶4 In opposition to the evidence proffered by the Schmidts, the Board submitted several pieces of evidence including an appraisal from Lisa Martin, an appraiser for the Salt Lake County Assessor's office. Martin determined that the value of the land should be calculated by using the $706,000 figure and reducing it by 20 percent due to stigma from the contamination. A 20 percent reduction for stigma is a standard appraisal technique. She valued the property at $563,900. The Board also disputed that it was necessary to remove as much soil as the Sitex bid suggested. It argued that because only three soil samples had been taken on the entire 2.7 acres, there was insufficient evidence to prove that the entire property

was contaminated. Furthermore, the Board pointed out that there was no evidence that the EPA or UDEQ would require any sort of a clean-up on this residential property. Finally, the Board offered evidence that the problem had been partially cured when the Schmidts placed additional topsoil on portions of the 2.7 acres.

¶5 In its findings of fact, conclusions of law, and final decision, the Commission found that the fair market value of the land was zero but that the fair market value of the home was $398,166. It explained this result in the following manner. While "[t]he normal method of calculating the value of a contaminated property is to deduct the costs of remediation from the value of the property as calculated before any deduction for contamination ... in this case, it would result in a negative value.... If a property had a negative value, that would also imply that the property was uninhabitable." Because petitioners and their small children live in the home, and "in very nice circumstances," the Commission reasoned that the property must have some positive value. The normal valuation methodology was not used because it produced a number that did not reflect reality. Since the Commission determined that the property had "value-in-use,"[1] it came up with an alternative methodology. The Commission treated the land and the home separately. It did this because the building itself was not contaminated and the harm to the value of the overall property was due to the contamination in the soil. It therefore set the value of the land at zero and the value of the building at $398,166, a figure reached by using the standard replacement cost new less depreciation method. The result was a valuation for the house and land of $398,166.

¶6 The issue before this court is whether the Commission committed reversible error in fixing the property's value at $398,166. We first address the standard of review. We have held that the choice of valuation methodology used in fixing the value of a property is a question of fact. *See Beaver County v.*

1. "Value-in-use" was defined by the Iowa Supreme Court in *Boekeloo v. Board of Review of Clinton,* 529 N.W.2d 275 (Iowa 1995), when it held that "[t]he transitory absence of a market does not eliminate value.... The mere fact that a property is unmarketable does not mean it has no value, especially when it is being used for its intended purpose." *Id.* at 278.

*Utah State Tax Comm'n,* 916 P.2d 344, 355 (Utah 1996) (holding that Commission's decision to reject a certain valuation methodology is a finding of fact). Therefore, we "grant the commission deference concerning its written findings of fact, applying a substantial evidence standard of review." Utah Code Ann. § 59–1–610(1)(a) (1996). Furthermore, "when reviewing an agency's decision, this court does not ... reweigh the evidence." *Questar Pipeline Co. v. Utah State Tax Comm'n,* 850 P.2d 1175, 1178 (Utah 1993).

■ ¶ 7 Under this standard, we uphold the Commission's findings of fact if they are " 'supported by *substantial evidence based upon the record as a whole.*' " *Cache County v. Property Tax Div. of Utah State Tax Comm'n,* 922 P.2d 758, 767 (Utah 1996) (emphasis added) (quoting *Zissi v. State Tax Comm'n,* 842 P.2d 848, 852 (Utah 1992)). "Substantial evidence" is that quantum and quality of relevant evidence which is adequate to convince a reasonable mind to support a conclusion. *See Cache County,* 922 P.2d at 767; *Utah Ass'n of Counties v. Tax Comm'n of Utah,* 895 P.2d 819, 821 (Utah 1995); *First Nat'l Bank v. County Bd. of Equalization,* 799 P.2d 1163, 1165 (Utah 1990); *Hercules Inc. v. Utah State Tax Comm'n,* 877 P.2d 169, 172 (Utah Ct.App. 1994). In addition, a party challenging the Commission's factual findings bears the burden of marshaling all evidence supporting the findings and showing that this evidence is insufficient. *See Kennecott Corp. v. Utah State Tax Comm'n,* 858 P.2d 1381, 1385 (Utah 1993); *First Nat'l Bank,* 799 P.2d at 1165.

¶ 8 Both the Schmidts and the Board challenge the Commission's factual findings. The Schmidts argue that the Commission erred in valuing the home and the land separately. The Board argues that the Commission erred in fixing the land's value at zero and argues that the Commission should have used the Board's valuation for the house and land, making a percentage reduction for stigma instead.

■ ¶ 9 The Commission was not bound to accept either the Schmidts' or the Board's valuations; it "ha[s] the discretion to adopt a figure that [falls] somewhere between ... polarized estimates." *Utah Ass'n of Counties,* 895 P.2d at 823. What is required of the Commission is that it value the property based on its "fair market value." *See* Utah Code Ann. § 59–2–103(1) (1996).[2] "Fair market value" has been statutorily defined as: "the amount at which property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of the relevant facts." *Id.* § 59–2–102(8) (1996).[3] In arriving at the fair market value, this court has said that the Commission uses one of the following recognized approaches: cost, income, and market. *See Beaver County,* 916 P.2d at 347. The cost approach determines the property value based on its replacement cost less depreciation. *See id.* The income approach determines property value by computing the present value of anticipated income. *See id.* The market approach determines property value by examining the prices at which comparable properties have been bought and sold. *See id.*

¶ 10 The Commission stated that the "normal method" of calculating the value of contaminated property is to deduct the costs of remediation from the value of the property as calculated before any deduction for the contamination. However, the Commission decided not to apply the "normal method." Instead, it attempted to fix the value of the property in use. This court has never established a proper method for fixing the value of contaminated property. Other jurisdictions have. Some have applied a method similar to the Commission's "normal method." *See, e.g., Almor Corp. v. County of Hennepin,* 566 N.W.2d 696, 701 (Minn.1997) (holding that in

---

**2.** Section 59–2–103 states:

    (1) All tangible taxable property shall be assessed and taxed at a uniform and equal rate on the basis of its fair market value, as valued on January 1, unless otherwise provided by law.

**3.** Section 59–2–102(8) is now codified at section 59–2–102(9). The change to section 59–2–102 occurred in 1998 and does not affect this case.

cases where property is a Superfund site and experts agree that clean-up cost should be deducted from appraisal value, court should deduct clean-up cost from value of property); *Westling v. County of Mille Lacs,* 543 N.W.2d 91 (Minn.1996) (upholding tax court's reduction of value to zero based on reduction for clean-up). But others have not accepted that the cost of clean-up ought to be fully deducted from the value of the property. *See, e.g., Boekeloo v. Bd. of Review of Clinton,* 529 N.W.2d 275, 278 (Iowa 1995) (finding that most courts that have fixed value of contaminated properties *acknowledge* that contamination has an adverse effect and require assessors to *consider* effect of contamination on property); *Inmar Assoc., Inc. v. Borough of Carlstadt,* 112 N.J. 593, 549 A.2d 38, 44–45 (1988) (suggesting that appraisers view properties like special-purpose properties or consider value-in-use to owner); Bonnie H. Keen, *Tax Assessment of Contaminated Property: Tax Breaks for Polluters?,* 19 B.C. Envtl. Aff. L.Rev. 885, 906 (1992) ("For varying reasons, the majority of cases have rejected taxpayers' assertions of zero or nominal value."); Peter J. Patchin, *Valuation of Contaminated Properties,* 56 Appraisal J. 7, 13 (1988) (stating that it is not reasonable to conclude that contaminated property is unmarketable when it is being used for its intended purpose, but suggesting consideration of stigma and value-in-use).[4]

¶ 11 Here, the Commission made a judgment about the value-in-use of the home and the land. The evidence before it valued the property between $706,000 and zero. The Commission has the discretion to take that conflicting evidence into account and to arrive at a number in between. *See Utah Ass'n of Counties,* 895 P.2d at 823. It did so in this case. The Schmidts and the Board

have not carried their burden of demonstrating that the resulting valuation is without substantial evidentiary support in the record. There was evidence in the record that the clean-up would cost over a million dollars. That evidence was not, however, very persuasive. The Sitex bid was based only on three soil samples on the entire 2.7 acres. It showed varying degrees of toxicity at the different sampling sites. The uniform property-wide remedy Sitex suggested was thus not tailored to the site. The Commission could have reasonably concluded that the bid was excessive. At the same time, the Commission had other evidence that the simple mathematical deduction of clean-up costs from the initial appraisal did not reflect the real usable value of the property, or the actual impairment that resulted from the contamination. The Schmidts brought new topsoil onto the property. They live on the property in a large house with their small children. They have a vegetable garden on the property and consume the vegetables. No agency had required any clean-up or had even done an evaluation of the property. Based on all this, we cannot say that the Commission's valuation was not supported by substantial evidence. The evidence is sufficient to convince a reasonable mind to accept it as supporting the Commission's conclusion. This is particularly the case where, as here, the propriety of the Commission's methodology of valuing the land and the house separately is a question of fact and not law.

¶ 12 In conclusion, we affirm the Commission's valuation of the property at $398,-166.

¶ 13 Chief Justice HOWE, Justice RUSSON, and Judge JACKSON concur in Justice ZIMMERMAN'S opinion.

4. The Board also argues that the Commission erred as a matter of law in reducing the value of the land to zero. It contends that the Commission should only reduce the value of property by the cost of a clean-up where the taxpayer has shown all the following: the land is contaminated, the taxpayer is required to clean up the land, and the taxpayer can show with reasonable certainty the cost of a clean-up. The Board relies on a Washington case, *Weyerhaeuser Co. v. Easter,* 126 Wash.2d 370, 894 P.2d 1290, 1298 (1995). We decline to adopt the *Weyerhaeuser* test in this case or to mandate an element of the

valuation methodology. First, we have heretofore declined to detail a methodology for reaching a fair market value as a matter of law. Second, *Weyerhaeuser* involved a paper mill which was required to install pollution control devices. Here we are dealing with the fair market value of a residential property. While the lack of a conclusive clean-up estimate may be relevant to fixing the value, we are not persuaded that its absence should mean that the contamination must be ignored, as *Weyerhaeuser* would require.

¶ 14 Justice STEWART concurs in the result.

¶ 15 Having disqualified herself, Associate Chief Justice DURHAM does not participate herein; Court of Appeals Judge NORMAN H. JACKSON sat.

