2000 UT 57

COUNTY BOARD OF EQUALIZATION OF WASATCH COUNTY, State of Utah, Petitioner,

v.

STICHTING MAYFLOWER RECRE-ATIONAL FONDS, Stichting Mayflower Mountain Fonds, and Utah State Tax Commission, Respondents.

No. 980013.

Supreme Court of Utah.

July 7, 2000.

Daniel H. Matthews, Joseph T. Dunbeck, Jr., Heber City, for petitioner.

Jan Graham, Att'y Gen., Timothy A. Bodily, John C. McCarrey, Kelly W. Wright, Asst. Att'ys Gen., E. Craig Smay, Salt Lake City, for respondents.

DURRANT, Justice:

¶ 1 We granted petitions for a writ of certiorari to review the Utah Court of Appeals' decision in *County Board of Equalization of Wasatch County v. Stichting Mayflower Recreational Fonds*, 943 P.2d 238 (Utah Ct.App.1997). In that case, the court of appeals affirmed a ruling by the Utah State Tax Commission (Commission) that three parcels of real property owned by Stichting Mayflower Recreational Fonds (Mayflower) qualified for preferential greenbelt tax treatment under the Farmland Assessment Act (FAA) for the 1992 tax year. *See id.* at 247. For the 1993 tax year, however, the court of appeals partially reversed the Commission's ruling and held that only two of Mayflower's three parcels qualified for greenbelt status. We affirm in part and reverse in part.

## BACKGROUND

¶ 2 Mayflower owns several parcels of land in Wasatch County, Utah. The instant case concerns only three of these parcels (collectively referred to as the Mayflower property or parcels): (1) the North parcel, (2) the Density Determination parcel, and (3) the South Mountain parcel.[1] The North parcel lies east of U.S. 40 and slightly northwest of the Jordanelle reservoir. It contains 657.17 acres. Though nearby, the North parcel does not border either of the other two parcels. The Density Determination parcel lies south of the North parcel and extends west from Jordanelle. This parcel contains 1268.23 acres. U.S. 40 separates the northeastern portion from the bulk of the Density Determination parcel. The southwestern edge of the Density Determination parcel borders a northeastern edge of the South Mountain parcel. The South Mountain parcel extends west and southwest of this borderline. It contains 1495.11 acres.

¶ 3 In the early 1980s, Mayflower began leasing these three parcels to Luke Gillmore (Gillmore), an officer of Gillmore Livestock Company. Gillmore grazes sheep and cattle on the Mayflower property and 1560 acres of his own adjoining land. Based on Gillmore's agricultural use of the land, Wasatch County (the County) granted greenbelt status to the Mayflower property beginning in 1985.

---

1. The court of appeals referred to the South Mountain parcel as the "other" property.

¶ 4 In 1992, the County determined that the Mayflower property no longer merited greenbelt status. Thus, the County assessed the parcels at their full fair market value for the 1993 tax year and imposed a rollback tax for 1988 to 1992. Mayflower appealed this determination to the Wasatch County Board of Equalization (the Board). The Board sustained the County's decision despite the hearing examiner's recommendation that sufficient grazing occurred on the Mayflower property to justify continued greenbelt status. Mayflower then appealed to the Commission.

¶ 5 At the Commission hearing, Gillmore testified concerning his use of the Mayflower property. Gillmore stated that he has produced livestock all his life and that his family has been in the livestock business since the 1800s. Gillmore testified that each year he grazes roughly 1200 to 1500 sheep and between 160 to 170 head of cattle on his own and Mayflower's property. Each summer, Gillmore transports the animals to the properties and then drops them off at various spots. From these drop-off spots, the animals can graze the rest of the properties because the Mayflower and Gillmore properties are essentially unfenced. Except for U.S. 40, no physical barriers prevent the livestock from grazing the whole area. Gillmore testified that the livestock did, in fact, graze the "entire length" of the combined properties. The Mayflower property, however, is especially important for Gillmore's grazing operation because it contains "a lot more water" than does the Gillmore land. Without the Mayflower property, Gillmore testified that he could not provide his animals sufficient water.

¶ 6 For several years in the mid to late 1980s, Gillmore set up a sheep camp each summer near the western edge of the South Mountain parcel. Gillmore would maintain this sheep camp for the entire summer, thereby grazing the land for a longer period of time than he had theretofore done. Accordingly, Gillmore paid Mayflower additional rent for this extended grazing of the South Mountain parcel. Sometime in the late 1980s, Gillmore stopped this practice due to the encroachment of civilization. With the growth of nearby developments in Park City and Deer Valley, more and more domestic dogs had appeared in the area. Because the dogs posed a serious threat to the sheep, Gillmore stopped taking the whole herd to the South Mountain parcel. As a result, Gillmore also stopped paying the extra rent for his extended use of the South Mountain parcel. However, he continued to pay the original base rent amount, which still entitled him to graze the South Mountain parcel. Although Gillmore no longer set up a sheep camp on the South Mountain property, "different bunches" of sheep periodically still wandered onto the parcel and grazed. Some cattle did likewise, although to a much lesser degree because of the parcel's steeper terrain. The livestock would graze South Mountain in this manner until Gillmore learned they were there and then he would return them to the herd. Gillmore could not estimate the number of livestock that continued to graze the South Mountain parcel in this manner.

¶ 7 Based on this and other evidence, the Commission reversed the Board's decision. The Commission concluded that the Mayflower property sufficiently complied with FAA requirements, thereby warranting greenbelt status for the 1992 and 1993 tax years. Accordingly, the Commission granted the property greenbelt status and lifted the rollback tax the County had imposed. The Board petitioned the Commission to reconsider its order but was denied. The Board then petitioned this court to review the Commission's decision. We transferred the case to the court of appeals pursuant to Utah Code Ann. § 78-2-2(4) (1996). The court of appeals affirmed the Commission's ruling as to the 1992 tax year. *See Stichting Mayflower*, 943 P.2d 238, 247 (Utah Ct.App.1997). As for the Commission's decision concerning the 1993 tax year, the court of appeals partially reversed the Commission by holding that the South Mountain parcel should be assessed separately and as a separate parcel it did not qualify for greenbelt treatment. *See id.* The court of appeals also held that there were no grounds for imposing a rollback tax. *See id.* at n. 4. Both Mayflower and the Board filed petitions for writ of

certiorari to review the court of appeals' decision. We granted those petitions.

¶ 8 The parties have raised numerous issues for review, which center on two fundamental questions: (1) whether the South Mountain parcel should be assessed by itself or in conjunction with the other parcels, and (2) whether the appropriate unit to be assessed qualified for greenbelt status for the 1992 and 1993 tax years.

## STANDARD OF REVIEW

¶ 9 On certiorari, we review the court of appeals' decision for correctness. The correctness of the court of appeals' decision depends on whether it accurately reviewed the Commission's decision based on the appropriate standard of review. *See Newspaper Agency Corp. v. Auditing Div.,* 938 P.2d 266, 267–68 (Utah 1997). In this case, the Utah Code prescribes the appropriate standard for reviewing a decision by the Commission. The Commission's legal conclusions are reviewed under a correction of error standard. *See* Utah Code Ann. § 59–1–610(1)(b) (1996). The Commission's written findings of fact are reviewed under a substantial evidence standard. *See id.* § 59–1–610(1)(a). This means the reviewing court—the court of appeals in this case—should uphold the Commission's factual findings if the findings are supported by substantial evidence. *See Schmidt v. Utah State Tax Comm'n,* 1999 UT 48, ¶ 7, 980 P.2d 690. " 'Substantial evidence' is that quantum and quality of relevant evidence which is adequate to convince a reasonable mind to support a conclusion." *Id.* (citations omitted).

## ANALYSIS

¶ 10 The FAA provides an exception to the general rule that land is assessed for property tax purposes based on its "highest and best" use. *See Board of Equalization of Salt Lake County v. Utah State Tax Comm'n ex rel. Judd,* 846 P.2d 1292, 1295 (Utah 1993). Under the FAA, qualifying agricultural property is taxed according to its agricultural value, whether or not this is the land's "highest and best" use. The legislature enacted the FAA because it recognized that

urban growth was encroaching on rural areas and that if farmland was taxed at market value, farmers whose properties were located near expanding urban areas would find it difficult to continue to devote their property to low-profit farming operations. Thus, the purpose of the FAA was to benefit those individuals and entities that continued to use land for agricultural purposes, particularly when the property was located near urban development.

*Id.* at 1297.

## I. DETERMINING THE APPROPRIATE PROPERTY UNIT TO BE ASSESSED

¶ 11 To properly apply a property tax statute like the FAA, one must first determine the unit of property to be assessed. In the instant case, the Commission determined that the Mayflower property should be assessed as a whole, not parcel by parcel. The court of appeals concluded that the South Mountain parcel should be assessed separately, at least for the 1993 tax year. *See Stichting Mayflower,* 943 P.2d at 246 (Utah Ct.App.1997). The court of appeals gave several reasons for this conclusion. First, the court determined that the South Mountain parcel, "for all practical purposes," was not contiguous to the other two parcels. *See id.* Second, the court found that Gillmore did not pay rent for the South Mountain parcel. *See id.* Third, the court determined that the South Mountain parcel was "not grazed like the remaining parcels." *Id.* Finally, the court concluded that the South Mountain parcel was not needed to maintain or support grazing on the other two parcels. *See id.*

¶ 12 The size of the property unit to be assessed for property tax purposes is primarily a factual determination. Therefore, the court of appeals was obligated to uphold the Commission's decision to assess the Mayflower property as a whole unless the court found that the Commission's decision was not supported by substantial evidence. Only then could the court of appeals supplant the Commission's factual finding with its own. We conclude that the court of

appeals failed to correctly apply this standard.

■ ¶ 13 The Commission's decision is supported by substantial evidence. The Mayflower property has historically been treated as a single grazing unit by all the relevant parties: Mayflower, Gillmore, and the County. Mayflower leased all three parcels as a single grazing unit. The lease agreement granted Gillmore rights to all three parcels, and under the terms of the lease, Gillmore paid one undifferentiated amount for those rights. Further, Gillmore grazed the Mayflower property as a single unit since the early 1980s. The various parcels are essentially unfenced and Gillmore testified that livestock wandered the entire area. Moreover, the County granted the whole Mayflower property greenbelt status from 1985 to 1992, at which time it decided the property, as a whole, no longer merited greenbelt treatment. The court of appeals erred in finding that the South Mountain parcel should be assessed separately from the remainder of the Mayflower parcels because the foregoing evidence is adequate to convince a reasonable mind to support the Commission's decision to assess all the Mayflower parcels as a single unit.

¶ 14 In addition to this evidence, the Commission's determination is supported by case precedent and statute. In *Judd*, we faced the question of whether to assess twelve residential lots of land as a separate parcel or as part of an adjoining twenty-nine acre farm for FAA purposes. We decided that the lots should be considered as part of the farm because they both had been "farmed as a single agricultural unit" from 1987 to 1989. *Judd*, 846 P.2d at 1296 (footnote omitted). The instant case supports the same conclusion in light of the fact that Gillmore grazed the Mayflower property as a single agricultural unit for over ten years. Moreover, the FAA itself appears to indicate a preference for treating contiguous parcels under the same ownership as one unit rather than as separate parcels. Section 59-2-512 of the FAA states, "Where contiguous land in agricultural use in one ownership is located in more than one county, compliance with the requirements of this part shall be determined

on the basis of the total area and income of that land." Utah Code Ann. § 59-2-512 (1996). Although this section applies specifically to parcels located in different counties, the underlying principle would seem to apply equally to contiguous parcels located entirely within one county.

¶ 15 In sum, we hold that the court of appeals erred in determining that the South Mountain parcel should be assessed independently of the other parcels. Under a correct application of the substantial evidence standard of review, the court of appeals is bound to uphold a factual determination of the Commission if it is supported by substantial evidence, even if the court disagrees with that determination.

## II. THE MAYFLOWER PROPERTY'S QUALIFICATIONS FOR GREENBELT STATUS

¶ 16 To qualify for greenbelt status, the Mayflower property must satisfy several criteria set forth in the FAA. These criteria were amended effective January 1, 1993. Because the parties contest the 1992 and 1993 tax year assessments, we must analyze both versions of the FAA.

### A. The 1992 FAA Requirements for Greenbelt Status

■ ¶ 17 For the 1992 tax year, the FAA allowed land to be greenbelted if the property (1) was five contiguous acres or more; (2) had a gross agricultural income of $1000 or more; (3) was "actively devoted to agricultural use"; and (4) had been "actively devoted to agricultural use for at least two successive years immediately preceding the tax year in issue." Utah Code Ann. § 59-2-503(1) (1992).

■ ¶ 18 The only disputed issue regarding Mayflower's eligibility for greenbelt status for 1992 is whether the Mayflower property was "actively devoted to agricultural use." This is a matter of statutory construction. *See Judd*, 846 P.2d at 1295 (stating that whether land qualifies for "greenbelt assessment under the FAA is a question of statutory construction"). The court of appeals, therefore, owed no deference to the

Commission's ruling on this issue. Likewise, we give no deference to the court of appeals' decision on this particular point. We interpret taxation statutes like the FAA "liberally in favor of the taxpayer." *Salt Lake County ex rel. County Bd. of Equalization v. Utah State Tax Comm'n ex rel. Kennecott Corp.,* 779 P.2d 1131, 1132 (Utah 1989).

¶ 19 The Commission decided that the Mayflower property was actively devoted to agricultural use for 1992. Though acknowledging that the agricultural use of the South Mountain parcel had diminished, the Commission ruled that the Mayflower property as a whole complied with the greenbelt requirements. The Commission relied on the following facts to arrive at its conclusion: "substantial agricultural use has occurred on the [Mayflower] property"; all the Mayflower property is available for Gillmore's use; there are no legal or physical barriers to prevent Gillmore's use of the whole property; and the lease agreement specifically provides that the Mayflower property be used for agriculture.

¶ 20 The court of appeals affirmed the Commission's ruling, focusing its analysis on the South Mountain parcel's active devotion to agricultural use. *See Stichting Mayflower,* 943 P.2d at 244. The court of appeals based its ruling on a thorough analysis of three Utah Supreme Court decisions that defined the phrase "actively devoted to agricultural use" for purposes of the pre-amendment FAA. *See id.* at 242–44 (discussing *Judd,* 846 P.2d 1292; *Salt Lake County ex rel. County Bd. of Equalization v. Utah State Tax Comm'n ex rel. Bell Mountain Corp.,* 819 P.2d 776 (Utah 1991); *Kennecott Corp.,* 779 P.2d 1131).

¶ 21 The Board argues that the court of appeals erred in ruling that the South Mountain parcel was "actively devoted to agricul-

tural use." We need not consider this argument. As discussed above, Mayflower's property should be assessed as a single unit, not parcel by parcel. Viewing the Mayflower property as a whole, it was undisputedly "actively devoted to agricultural use" under the 1992 version of the FAA. Mayflower leased its property as graze land and Gillmore utilized it as such to a substantial degree. We therefore affirm the court of appeals' ultimate conclusion that the Mayflower property warranted greenbelt status for the 1992 tax year.[2]

### B. The 1993 FAA Requirements for Greenbelt Status

¶ 22 Beginning in 1993, the FAA allowed land to be greenbelted if the property (1) is five contiguous acres or more; (2) is "actively devoted to agricultural use," meaning the land produces over 50% of its agricultural capacity; and (3) has been so used for the two years "immediately preceding the tax year in issue." Utah Code Ann. § 59–2–503(1), (2)(a) (1992).[3] In comparison with the previous version of the FAA, the amended FAA simply dropped the $1000 income requirement and created a definition for the "actively devoted to agricultural use" requirement; namely, the property must produce over 50% of its agricultural capacity.

¶ 23 The parties dispute whether the Mayflower property meets the 50% production requirement. This is an issue of fact. Therefore, the court of appeals should have reviewed the Commission's determinations under the substantial evidence standard.

¶ 24 The Commission determined that the Mayflower property satisfied the 50% production minimum. The court of appeals partially reversed the Commission by holding that the North and Density Determination parcels met the requirement but the South

---

2. We express no view on the court of appeals' analysis specific to the South Mountain parcel because we need not address that issue. It appears from the court of appeals' opinion that it limited its analysis to the South Mountain parcel because the Board was only disputing that parcel's qualifications under the FAA. *See Stichting Mayflower,* 943 P.2d at 244 (The "County" in the court of appeals' decision refers to the Wasatch County Board of Equalization).

3. The 1992 replacement volume, 6B, containing title 59 of the Utah Code, offers both the 1992 version and the amended 1993 version of the FAA. For ease of comparison and reference we cite to the 1992 replacement volume for both versions of the FAA.

Mountain parcel, assessed separately, did not meet the requirement. *See Stichting Mayflower*, 943 P.2d at 246–47. The Board agrees with the court of appeals' ruling but argues in the alternative that if the Mayflower property must be assessed as a whole it cannot satisfy the production requirement. Mayflower argues that its property, as a whole, meets the 50% requirement, and that the court of appeals erred by assessing the South Mountain parcel by itself.

¶ 25 To determine whether the Mayflower property satisfies the FAA production requirement we must know the production capacity of the graze land and how much of that capacity was actually used.

1. Production Capacity

¶ 26 To assist government entities in ascertaining the agricultural production capacity for a given type of land, the FAA lists three sources for consultation. *See* Utah Code Ann. § 59–2–503(2)(b). However, none of the listed sources provides production levels for grazing purposes. Therefore, the Commission has published interim production guidelines for graze lands. These guidelines establish four categories of graze land and provide production capacities for each category. The guidelines measure production capacity in terms of Animal Unit Months (AUMs). Essentially, an AUM is the "forage required to maintain" 1 adult cow or 5 adult sheep "in thrifty condition for an average month of the year."

¶ 27 The Mayflower property is classified as Graze II, which means it has a production capacity of .63 AUMs per acre. To determine the overall production capacity of the Mayflower property one would simply multiply the AUM capacity of the land (.63 AUM per acre) by the total number of acres grazed

by Gillmore's livestock.[4] The parties contest what that total number of grazed acres should be.

¶ 28 The Commission found that Gillmore grazed a total of 4714 acres. That total included 3420 acres of Mayflower property (North parcel, 657.17 acres; Density Determination parcel, 1268 acres; and South Mountain parcel, 1495.11 acres) and approximately 1300 acres of Gillmore's land.[5] The Board argued to the court of appeals that the Commission had not included the South Mountain acres in its total acreage finding. The court of appeals adopted the Board's assertion. *See Stichting Mayflower*, 943 P.2d at 246–47. However, the court did not go on to expressly review the Commission's total acreage findings because the court erroneously determined that the South Mountain parcel should be assessed separately. *See id.* Although not expressly stated, the court of appeals' position is nevertheless apparent. By virtue of adopting the Board's total acreage argument, the court of appeals necessarily espoused the view that the total acreage should be 6209 (4714 plus 1495 South Mountain acres).

¶ 29 The Board argues that the court of appeals should be affirmed on this point because the Commission's acreage findings did not include the South Mountain acres. The Commission acknowledges in its brief that it did make a slight mistake concerning the total number of acres. The Commission correctly notes that Gillmore actually grazed 1560 of his own acres along with the Mayflower property acres, not 1300 acres as the Commission initially found. Accordingly, the Commission proposes that the actual total acreage should be 4980.5, not 4714.

---

4. The parties do not dispute that an accurate determination of the Mayflower property's production capacity and its actual production must be based on the total number of acres grazed by the livestock, not just the Mayflower acres at issue in the instant case.

5. In a motion for reconsideration filed with the Commission, the Board argued that the Commission should have included additional substantial acreage in its calculation. However, the Commission declined to do so because of insufficient evidence. The Board now argues that by so

ruling the Commission erroneously placed the burden of proof on the Board to establish the total number of acres grazed. We disagree. Mayflower provided evidence concerning the total number of acres it believed Gillmore grazed. If the Board believed those acreage figures were wrong, it was the Board's burden, not Mayflower's, to offer evidence supporting its version of the facts. To hold otherwise would require Mayflower to prove the Board's "theory of the case." We will not endorse such a result.

¶ 30 We agree with the Commission and therefore reverse the court of appeals. Gillmore grazed a total of 4980.5 acres. There is no basis in the record for the court of appeals' suggestion that the Commission did not include the South Mountain parcel in its acreage calculation. Finding 20 of the Commission's Final Decision expressly includes South Mountain's 1495 acres as part of the 3420 total acres Mayflower leased to Gillmore. Finding 24 then clearly indicates that the Commission added Mayflower's 3420 acres, which included the South Mountain acres, to an unspecified number of Gillmore acres to arrive at the 4714 total acreage figure currently in dispute. In light of the fact that the parties stipulated that the Mayflower property totaled 3420.51 acres, the only disputable acreage in the Commission's Final Decision involves Gillmore's land. And, in fact, as the Commission admits on appeal, it originally mistotaled Gillmore's land by roughly 260 acres. Although the Commission erred on its total acreage finding, its decision will stand unless its error "substantially prejudiced" the Board, i.e., if the Mayflower property cannot satisfy the 50% production requirement given 4980 total acres. *See* Utah Code Ann. § 63–46b–16(4) (1997).

¶ 31 Based on the foregoing, the production capacity of the Gillmore and Mayflower properties is 3138 AUMs (4980.5 total acres multiplied by .63 AUM capacity per acre).

6. 1500 sheep divided by 5 equals 300 animal units

300 animal units multiplied by 4 months equals 1200 AUMs

175 cows (each equivalent to one animal unit) multiplied by 3 months equals 525 AUMs

1200 AUMs plus 525 AUMs equals 1725 total AUMs

7. It is certainly true that Gillmore substantially reduced his use of the South Mountain parcel due to the threat posed by domestic dogs. He stopped setting up sheep camp on the South Mountain parcel, no longer took the whole herd to the parcel, and when "different bunches" of sheep would wander onto the parcel and graze he would return them to the herd. Nevertheless, he continued to pay rent for grazing rights to the South Mountain parcel, and, in fact, some livestock did still graze the parcel. While the extent of this grazing may well be insufficient to qualify the South Mountain parcel, if assessed alone for greenbelt status, when the parcel is included for assessment with the other two parcels, the prop-

To satisfy the FAA's 50% production requirement, the evidence must show that the lands produced over 1569 AUMs.

2. Actual Usage

¶ 32 Actual AUM usage is calculated by multiplying the number of animal units that graze the land by the number of months the animal units graze. Under the Commission's interim guidelines, 1 cow or 5 sheep equal 1 animal unit. The Commission found that 1500 sheep grazed the property for 4 months and that 175 cows grazed the property for 3 months. Thus, the Commission found that actual production equaled 1725 AUMs.[6] Without engaging in any type of review of the Commission's AUM analysis, the court of appeals concluded that the North and Density Determination parcels satisfied the production requirement while the South Mountain parcel did not. *See Stichting Mayflower*, 943 P.2d at 246. As stated above, the court of appeals should have assessed the Mayflower property as a whole.[7] We therefore reject its conclusions on this point.

¶ 33 The Board argues that the Commission erred in finding 1725 AUMs of grazing on the Gillmore and Mayflower property and that based on Gillmore's undisputed testimony the properties only produced 1590 AUMs.[8] To satisfy the greenbelt require-

erty as a whole qualifies for such status. For the reasons we have set forth, we conclude that the Commission's decision to treat the three parcels as a single unit was supported by substantial evidence. Namely, the South Mountain parcel is contiguous to the Density Determination parcel, Mayflower leased all three parcels as one agricultural unit, Gillmore paid for the right to graze the parcels as one agricultural unit, and the County historically taxed the parcels as a single unit. In sum, notwithstanding the diminished use of the South Mountain parcel, Gillmore utilized the other two parcels to such an extent that even when the South Mountain parcel is included, the Mayflower property as a whole still met the 50% production requirement.

8. The Board asserts that Gillmore grazed 50 cows for 3 months (150 AUMs) and 120 cows for 2 months (240 AUMs) for a total of 390 AUMs. Adding 390 cow AUMs to the 1200 sheep AUMs, which the Board apparently does not dispute, equals 1590 AUMs.

ment, however, Mayflower need only show production of at least 1569 AUMs. Based on the Board's own assertions, then, Mayflower has met this requirement.

¶ 34 We affirm the Commission in holding that the Mayflower property qualified for greenbelt treatment for the 1993 tax year. Although the Commission erred in calculating the total acreage of the grazed land, the error did not prejudice the Board. The Mayflower property still satisfied the 50% production requirement even with the corrected total acreage.

## CONCLUSION

¶ 35 We affirm the court of appeals' ruling that the whole Mayflower property met the FAA requirements for greenbelt status for the 1992 tax year. We reverse the court of appeals' ruling that the South Mountain parcel should have been assessed separately under the amended FAA for the 1993 tax year. In effect, we hold that the court of appeals should have affirmed the Commission's decision.

¶ 36 AFFIRMED in part and REVERSED in part.

¶ 37 Chief Justice HOWE, Associate Chief Justice RUSSON, Justice DURHAM, and Justice WILKINS concur in Justice DURRANT's opinion.