1999 UT App 094

**YEARGIN, INC., Petitioner,**

v.

**TAX COMMISSION and State of Utah, Respondents.**

No. 981342–CA.

Court of Appeals of Utah.

March 25, 1999.

Robert A. Peterson, Giauque, Crockett, Bendinger & Peterson, Salt Lake City, for Petitioner.

Jan Graham and Gale Francis, Salt Lake City, for Respondents.

Before Judges BILLINGS, JACKSON, and ORME.

## OPINION

JACKSON, Judge:

¶1 Yeargin, Inc. (Yeargin) appeals from the Tax Commission's decision affirming the Audit Division's assessment of sales tax on materials incorporated by Yeargin into the facility it built for WECCO in Iron County and denying Yeargin's request for a refund. We affirm.

## BACKGROUND

¶2 On June 28, 1988, Yeargin contracted with WECCO to build a manufacturing facility outside Cedar City, Utah (Cedar City plant).[1] Several provisions of the contract between Yeargin and WECCO (Contract) are relevant to this appeal. First, the Contract's General Provisions provided that "neither [Yeargin] or [sic] its subcontractors, nor their respective employees, shall be deemed to be the employees or agents of [WECCO]." Second, the Contract provided that Yeargin would obtain "a builder's Broad Form All Risk or equivalent insurance policy covering Work in the course of construction including all rigging, material, supplies and equipment furnished for the Work at the Project site or in transit thereto." Paragraph 17 of the Contract—the paragraph most critical to this dispute—provided that "Title to all material and equipment procured by [Yeargin] to be incorporated into the Project, shall pass to [WECCO] upon delivery to common carrier or at the Project site, whichever is provided for in the purchase order."

¶3 Exhibit "A" to the Contract, which detailed costs for which WECCO would reimburse Yeargin, provided in subsection (i) that

---

1. We refer to the contracting parties as "Yeargin" and "WECCO" for simplicity, although the contract was actually formed between the parents of both companies. United Engineers and Constructors, Inc., was Yeargin's parent, and Pepcon Production, Inc., an affiliate of Pacific Engineering and Production Company, was WECCO's parent.

"[t]he cost of plant equipment, materials, tools, utilities and supplies procured or furnished by [Yeargin] in connection with the performance of the Work" would be reimbursed by WECCO. A March 3, 1989 amendment added the following to subsection (i): "Except for rentals, all such plant equipment, materials, tools, utilities and supplies shall be the property of [WECCO] from and after the date of Final Acceptance of the Work."

¶ 4 In 1991, the Tax Commission's Auditing Division audited Yeargin. The Auditing Division reviewed purchase orders, purchase order status reports, checks, ledgers, and sales tax returns. The Auditing Division then issued a Statutory Notice and a Utah Sales and Use Tax Audit Summary, both dated September 17, 1992. Items that the Auditing Division considered to have been purchased by Yeargin for conversion into real property were summarized on Schedule 1 of the Audit Summary. Schedule 2 of the Audit Summary listed tangible personal property purchased by Yeargin but not converted into real property. Yeargin was credited for taxes it had already paid and also for any items that qualified for the manufacturer's exemption. The total tax calculated was $67,827.86. Yeargin paid that amount to avoid accruing interest charges and then filed a refund claim.

¶ 5 At the same time the Auditing Division was auditing Yeargin, it was also auditing several other entities—including WECCO—which were involved with the construction of the Cedar City plant. On April 29, 1994, the Auditing Division, Yeargin, WECCO, and the other entities involved with the Cedar City plant entered into a joint stipulation of facts (Stipulation). Paragraph 12 of the Stipulation provided in relevant part that:

> During the course of construction of the facility ... WECCO entered into an agreement with United Engineers & Constructors, Inc. and its affiliate, Yeargin, for the purpose of providing assistance in the engineering, design and procurement for the construction of the [Cedar City plant]. United Engineers assisted WECCO in purchasing materials for use in the construction of the facility and located suppliers, obtained price quotations and arranged for WECCO to make purchases of materials. *Title to all materials purchased for use at the WECCO facility passed directly to WECCO from the suppliers.*

(Emphasis added.)

¶ 6 In late 1996, a few months before the refund claim was scheduled to be tried before the Tax Commission, Yeargin filed a Motion in Limine[2] seeking to require the Auditing Division to honor the Stipulation—that is, to require the Auditing Division to agree that title for all materials passed directly to WECCO and never rested in Yeargin's hands. The Auditing Division responded that the language of paragraph 12 was ambiguous and "le[ft] open the possibility that [Yeargin] may have purchased materials itself" to build the Cedar City plant. The Auditing Division also asserted that it had labored under an unspecified mistake of fact when it signed the Stipulation, and that it should be granted relief from the Stipulation because it had later discovered facts that led it to conclude that Yeargin had, in fact, purchased and consumed the materials. Although the record contains no order on this issue, the trial transcript shows that an Administrative Law Judge (ALJ) denied Yeargin's motion.

¶ 7 On March 13, 1997, the same ALJ conducted a formal hearing. Yeargin acknowledged that it was not challenging the amount of the tax assessment, but only whether it was in fact subject to the tax

---

**2.** Although Yeargin characterized this as a motion in limine, we note that motions in limine are for pretrial determinations that certain evidence should be admitted or excluded at trial. *See* 75 Am.Jur.2d *Trial* § 94 (1991) ("A motion in limine seeks a protective order prohibiting the opposing party, counsel and witnesses from offering offending evidence at trial, or even mentioning it at trial, without first having its admissibility determined outside the presence of the jury."). Yeargin's motion was more in the nature of a motion for summary judgment or a motion to dismiss. Yeargin's argument was, in effect, that the Stipulation mandated judgment for Yeargin as a matter of law, because if Yeargin never held title to the materials in question, it could not be assessed sales tax for those materials.

assessed. After the hearing the ALJ issued Findings of Fact, Conclusions of Law, and Final Decision (Findings), which the Tax Commission signed and adopted. The ALJ made the following relevant findings:

12. [Yeargin] assisted WECCO in purchasing materials for use in the construction of the facility and located suppliers, obtained price quotations and arranged for WECCO to make purchases of materials. In addition to assisting WECCO, United Engineers and Yeargin actually purchased some of the materials which were invoiced and billed to Yeargin and were paid for by checks from Yeargin. Yeargin ultimately installed those materials into the real property at the WECCO facility or consumed the materials in the construction process. The contract provides that title to all materials purchased for use at the WECCO facility would pass directly from suppliers to WECCO, but the invoices and checks indicate that some of the materials came to rest in the hands of Yeargin.

. . . .

17. The only items on which sales tax has been imposed upon [Yeargin] by [the Auditing Division] are those materials which were invoiced to [Yeargin] and/or were paid for by checks of [Yeargin].

18. In performing the audit, [the Auditing Division] looked only at who bought and paid for the materials. The source of those funds was not, and should not have been, material in determining whether or not [Yeargin] should have paid sales tax on the materials.

19. Petitioner converted the materials to real property, or personally consumed the materials in the construction of the project.

¶ 8 At the formal hearing, Yeargin argued that it had made no purchases and thus was not subject to any sales tax because title to the materials passed directly from the vendors to WECCO, bypassing Yeargin (who merely "procured" the materials). Further, Yeargin asserted that the Tax Commission was bound by the Stipulation, which also provided that title passed directly to WEC-CO. The Tax Commission interpreted paragraph 12 of the Stipulation to mean that

although one of the functions of [Yeargin] was to assist WECCO, that does not foreclose the possibility that [Yeargin] may have itself purchased materials for the construction of the facility. [Yeargin's] interpretation of paragraph 12 is one possible interpretation of the paragraph, but it is not the only possible interpretation. Further, [the Auditing Division] has submitted evidence which would indicate that [Yeargin's] interpretation of paragraph 12 does not accurately portray the facts as they were carried out by the parties.

The Tax Commission concluded that "Yeargin purchased the materials and installed those materials into the real property at the Cedar City facility or otherwise consumed those materials or supplies in the construction of that project. Under either event, sales and use tax would be due and owing from [Yeargin]." The Tax Commission thus affirmed the Auditing Division's assessment and denied Yeargin's request for a refund. This appeal followed.

## ISSUES AND STANDARDS OF REVIEW

¶ 9 Yeargin mainly contends that because the Contract provided that title to the materials in question would pass directly to WEC-CO, Yeargin is not responsible for sales tax on the materials. Sales to real property contractors are subject to sales tax if the real property contractor consumes the tangible personal property. *See* Utah Admin. Code R865–19S–58 (Supp.1997).[3] Whether Yeargin "is a real property contractor is a ruling that is based in part on law and in part on fact. . . . [W]e accordingly defer to the Tax Commission's determination [and] will not upset its ruling unless it is unreasonable or arbitrary." *Chicago Bridge & Iron Co. v. State Tax Comm'n*, 839 P.2d 303, 307 (Utah 1992).

¶ 10 Yeargin's challenge to the Tax Commission's finding that Yeargin actually purchased and consumed the materials in ques-

---

3. The earlier versions of this rule were numbered differently: The 1987–88 version is Rule 865–58S–1, and the 1989 version is Rule 865–19–58S. However, the general principle that real property contractors are subject to sales tax has remained unchanged.

tion is governed by section 59–1–610 of the Utah Code, which directs us to apply a "substantial evidence standard on review[,]" deferring to the commission's findings of fact.[4] Utah Code Ann. § 59–1–610 (1996).

¶ 11 Our resolution of this issue disposes of Yeargin's other arguments on appeal.

## ANALYSIS

¶ 12 Our task is to determine whether Yeargin is subject to sales tax for the disputed transactions. This question is controlled by section 59–12–103 of the Utah Code,[5] which imposes a tax on "retail sales of tangible personal property made within the state," and also by the Utah Rules of Administrative Procedure. Utah Code Ann. § 59–12–103 (Supp.1998). We apply the administrative rules in effect during the tax period in question, in this case, from October 1988 to December 1989. *See Chicago Bridge & Iron Co. v. State Tax Comm'n,* 839 P.2d 303, 306 (Utah 1992). Thus, two versions of the Utah Administrative Code apply to this case: the 1987–88 version (effective July 1, 1987) and the 1989 version (effective January 3, 1989).[6]

### I. Was Yeargin a Real Property Contractor?

■ ¶ 13 Although it conceded this point at the formal hearing, Yeargin argued on appeal that it was not a real property contractor. We disagree. Whether a party is a real property contractor "is based not only on who converts tangible personal property into real property, but also on the *nature of the transaction." Chicago Bridge & Iron Co. v. State Tax Comm'n,* 839 P.2d 303, 306 (Utah 1992) (emphasis added).

4. Section 59–1–610 provides:
   (1) When reviewing formal adjudicative proceedings commenced before the commission, the Court of Appeals or Supreme Court shall:
   (a) grant the commission deference concerning its written findings of fact, applying a substantial evidence standard on review; and (b) grant the commission no deference concerning its conclusions of law, applying a correction of error standard, unless there is an explicit grant of discretion contained in a statute at issue before the appellate court.
   (2) This section supercedes Section 63–4b–16 pertaining to judicial review of formal adjudicative proceedings.

¶ 14 A "contractor" is defined as "[o]ne who contracts to do work for another. This term is ... commonly reserved to designate one who, for a fixed price, undertakes to procure the performance of works or services on a large scale." *Black's Law Dictionary* 326 (6th ed.1990). A "general contractor" is defined as "[o]ne who contracts for the construction of an entire building or project, rather than for a portion of the work. The general contractor hires subcontractors ..., coordinates all work, and is responsible for payment to subcontractors." *Id.* at 683.

¶ 15 The scope of work for which Yeargin contracted with WECCO was described in the Contract as follows:

> Contractor [Yeargin] shall perform, as necessary for completion of the Project, the detailed design and engineering (including preparation of plans, specifications, construction drawings, and estimates); shall procure, deliver and install permanent materials and equipment; shall procure and deliver construction equipment, supplies, [and] tools; shall provide supervisory services and labor; and shall perform changes....

Thus, the Contract's plain language shows that Yeargin was a real property contractor. Further, the materials in question "bec[a]me inseparably meshed into a greater facility which itself [was] the object of the transaction." *B.J.-Titan Servs. v. State Tax Comm'n,* 842 P.2d 822, 829 (Utah 1992). Accordingly, we cannot say the Tax Commission's finding that Yeargin installed the materials in question into the real property or otherwise consumed them during construction was unreasonable or arbitrary.

Utah Code Ann. § 59–1–610 (1996). Section 59–1–610 applies to this case—even though it was not enacted until 1993—because it is a procedural rule. *See Board of Equalization v. Utah State Tax Comm'n ex rel. Benchmark, Inc.,* 864 P.2d 882, 884 (Utah 1993).

5. We cite to the current version of the statute, as the relevant language is unchanged from the 1989 version.

6. Although they are numbered differently, both versions of the rule are identical. *See infra* page 532.

## II. Was Yeargin a Consumer of the Materials?

¶ 16 Because Yeargin is a real property contractor, its tax liability is governed by the 1987–88 and 1989 versions of Rule 865–19S–58 of the Utah Rules of Administrative Procedure. Both versions of the relevant rule provided that:

> A. Sale of tangible personal property to real property contractors and repairmen of real property is generally subject to tax.
>
> 1. The person who converts the personal property into real property is the consumer of the personal property since he is the last one to own it as personal property.

Utah Admin. Code R865–58S–1 (1987–88); R865–19–58S (1989).

¶ 17 This rule, in one version or another, is a long established principle of our tax scheme. *See Utah Concrete Prods. Corp. v. State Tax Comm'n,* 101 Utah 513, 519–20, 125 P.2d 408, 411 (Utah 1942).

> The reason for this rule is that materials which are purchased and then converted into real property would escape the sales tax because a sales tax is not imposed on the sale of real property. Real property contractors are therefore treated as consumers because their purchases of materials that are incorporated into real property are the last transactions in which those materials can be subjected to the sales tax.

*Chicago Bridge & Iron Co. v. State Tax Comm'n,* 839 P.2d 303, 306 (Utah 1992).

¶ 18 The "crux of the issue," then, is whether Yeargin was the consumer of the items in question. *Tummurru Trades, Inc. v. Utah State Tax Comm'n,* 802 P.2d 715, 718 (Utah 1990). If Yeargin consumed the items, it is subject to sales tax. Under Rule 865–19S–58, "ownership is key in identifying the final consumer." *Thorup Bros. Constr., Inc. v. Auditing Div. of the Utah State Tax Comm'n,* 860 P.2d 324, 327 (Utah 1993).

¶ 19 Neither party squarely addressed the issue of whether Yeargin was a consumer of the materials under Rule 865–19S–58. Yeargin's argument, in effect, is that because the Contract provided that title passed directly to WECCO, Yeargin never owned the materials and thus could not have consumed them. The Auditing Division's argument amounts to an assertion that, notwithstanding the Contract, the *essence* of the transactions between Yeargin and the vendors was in the nature of a purchase, and Yeargin was therefore a consumer under Rule 865–19S–58.

¶ 20 We agree that to decide this question, we must look at the true nature of the transaction. *See Niederhauser Ornamental & Metal Works Co. v. Tax Comm'n,* 858 P.2d 1034, 1038 (Utah Ct.App.1993) (stating we look to nature of transactions when deciding whether joint venturer was real property contractor); *cf. Board of Equalization v. First Sec. Leasing Co.,* 881 P.2d 877, 878 (Utah 1994) (stating Tax Commission "was entitled to look to the essence of the transaction, irrespective of the legal form in which the parties to a transaction cast it" when determining whether taxpayer was lessor or owner).

¶ 21 Having examined the nature of the transaction, we conclude that the Auditing Division presented substantial evidence to show that Yeargin purchased the items in question. In determining who is a final consumer for tax purposes, we consider many different factors, including who issued the purchase orders, who issued checks to the vendors, and who inspected and had physical possession of the materials. *See Thorup Bros.,* 860 P.2d at 328 (holding religious high school, rather than contractor, was final consumer for sales tax purposes because school performed these functions). We have also considered who insured the materials, and who "exercised direct supervision" over them. *Id.* at 328. Whether a party "took title in its own name" is one factor, but not the only factor, to consider. *Id.* at 328; *see also Brown Plumbing & Heating Co. v. State Tax Comm'n,* 848 P.2d 181, 182–83 (Utah Ct.App.1993) (concluding school district, not contractor, was final consumer when contract said title would pass directly to school district and school district issued purchase orders, received and paid invoices, and insured construction materials), *aff'd,* 861 P.2d 435 (Utah 1993).

¶ 22 Although the contract specified, and Yeargin insists, that Yeargin never held title to the construction materials, we conclude the indicia of sale are sufficient to support the finding that Yeargin was the final consumer of the materials before they were incorporated into the real property. Yeargin, not WECCO, issued purchase orders for the transactions in question. Yeargin, not WECCO, received invoices from vendors and issued checks to pay for the materials. Also, the contract required Yeargin to insure the materials, and thus Yeargin "assumed the burden of risk" for them. *Thorup Bros.*, 860 P.2d at 328.

¶ 23 Further, the Contract provided that WECCO would *reimburse* Yeargin for "[t]he cost of plant equipment, materials, tools, utilities and supplies *procured or furnished* by [Yeargin] in connection with the performance of the Work." (Emphasis added.) Thus, the Contract itself contemplated that Yeargin might procure *or* furnish materials, and that Yeargin would pay for the materials initially. An amendment to this clause stated that those same items would become WECCO's property—i.e., that title would pass to WECCO—"from and after the date of Final Acceptance of the Work."

¶ 24 We also find unpersuasive Yeargin's argument that it was WECCO's agent in making the purchases. The Contract expressly prohibited Yeargin from acting as WECCO's agent. In light of these sometimes conflicting provisions, we agree that the record contains sufficient evidence to support the Tax Commission's finding that Yeargin in fact purchased and consumed the items in question.[7]

## CONCLUSION

¶ 25 Yeargin was a real property contractor. In addition, the nature of the transactions shows that Yeargin was the final consumer of the items in dispute and was thus liable for sales tax on the transactions in question. Accordingly, we hold that the Tax Commission's findings were supported by substantial evidence.

¶ 26 Affirmed.

¶ 27 I CONCUR: JUDITH M. BILLINGS, Judge

¶ 28 I CONCUR IN THE RESULT: GREGORY K. ORME, Judge

---

7. Our disposition of this issue also resolves the dispute over the Stipulation's effect. As to those purchases that WECCO made, assisted in whatever way by Yeargin, the Stipulation's provision that title passed directly to WECCO would hold true. However, the Auditing Division presented *substantial evidence that Yeargin also made purchases on its own.* We thus read the sentence governing passage of title as being dependent on the sentence immediately preceding it. *That is,* the provision that title passed directly to WECCO applies only to those transactions in which "[Yeargin] assisted WECCO in purchasing materials for use in the construction of the facility and ... arranged for WECCO to make purchases of materials," and does not apply to those transactions for which Yeargin issued purchase orders, received invoices, and issued checks.