2001 UT 11

**YEARGIN, INC., Petitioner,**

v.

**AUDITING DIVISION OF THE UTAH STATE TAX COMMISSION, Respondent.**

No. 990364.

Supreme Court of Utah.

Feb. 6, 2001.

Robert A. Peterson, John H. Bogart, Salt Lake City, for petitioner.

Mark Shurtleff, Att'y Gen., Gale K. Francis, Asst. Att'y Gen., Salt Lake City, for respondent.

HOWE, Chief Justice:

## INTRODUCTION

¶ 1 Petitioner Yeargin, Inc. seeks certiorari review of the court of appeals's decision upholding the Utah State Tax Commission's denial of Yeargin's sales tax refund claim.

*Yeargin, Inc. v. Tax Comm'n,* 1999 UT App 094, 977 P.2d 527.

## BACKGROUND

¶ 2 In 1988, an ammonium perchlorate (AP) manufacturing facility owned by Pacific Engineering and Production Co. of Nevada (PEPCON) exploded and was destroyed. PEPCON Production Inc. (PPI), an affiliate of PEPCON, received financing to rebuild a similar facility near Cedar City, Utah, under the condition that PPI form Western Electrochemical Company (WECCO) to complete the construction of and subsequently operate the new facility. Upon formation, WECCO became the owner of the new facility, which began production of AP in August 1989.

¶ 3 During construction, PPI and WECCO entered into an agreement with United Engineers and Constructors, Inc. (United) and its affiliate, Yeargin, wherein the parties agreed that

> Contractor [United and Yeargin] shall perform, as necessary for completion of the Project, the detailed design and engineering (including preparation of plans, specifications, construction drawings, and estimates); shall procure, deliver and install permanent materials and equipment; shall procure and deliver construction equipment, supplies, tools; shall provide supervisory services and labor; and shall perform changes ... all in accordance with the terms of this Agreement.

This construction agreement also provided that

> Title to all material and equipment procured by Contractor to be incorporated into the Project, shall pass to Owner [WECCO] upon delivery to common carrier or at the Project site, whichever is provided for in the purchase order.

¶ 4 In or around May 1991, the Auditing Division of the Utah State Tax Commission (Division) conducted an audit of Yeargin, reviewing purchase orders, purchase order status reports, checks, ledgers, and sales tax returns for items purchased in connection with the AP project from October 1, 1988, through December 31, 1989. In September 1992, the Division sent Yeargin a statutory

notice claiming it owed $67,827.86 sales and use tax.[1] Yeargin promptly paid the claimed tax amount to avoid further penalty and shortly thereafter filed a refund claim.

¶ 5 In April 1994, two years after Yeargin had paid the tax and filed a refund claim, and three years after the audit had commenced, the Division entered into a joint stipulation of fact[2] with Yeargin and other entities involved in construction of the AP facility.[3] Paragraph twelve of the stipulation reads as follows:

> During the course of construction of the facility PPI and WECCO entered into an agreement with United Engineers and Constructors, Inc., and its affiliate, Yeargin, for the purpose of providing assistance in the engineering, design and procurement for the construction of the AP manufacturing facility. United Engineers assisted WECCO in purchasing materials for use in the construction of the facility and located suppliers, obtained price quotations and arranged for WECCO to make purchases of materials. Title to all materials purchased for use at the WECCO facility passed directly to WECCO from the suppliers.

¶ 6 After the Division denied Yeargin's refund claim, Yeargin filed a petition for redetermination with the Utah State Tax Commission (Commission), which heard the petition in a formal hearing in March 1997. Prior to the hearing, Yeargin submitted a filing entitled "Memorandum of Points and Authorities in Support of Motion in Limine," in which it asked the Commission to dismiss the matter and award its requested refund. Yeargin reasoned in the motion that because the parties stipulated that title to all goods passed to WECCO directly from the suppliers (as per paragraph twelve of the stipulation), Yeargin "never purchased for [its] own account materials nor held title to such materials," and thus could not be liable for the sales tax. Yeargin claimed to have relied upon the stipulation and argued that it "cannot now be simply abandoned as inconvenient by the Auditing Division."

¶ 7 In its "Memorandum in Opposition to Petitioner's Motion in Limine," the Division asserted that the Commission should, in the interest of justice, relieve the parties from the binding effect of the stipulation. The Commission implicitly denied the motion in limine when it received evidence offered by the Division that Yeargin paid for certain materials used in the construction of the AP facility.

¶ 8 In its findings of fact, conclusions of law, and final decision, the Commission concluded, "based upon the evidence and testimony presented at the hearing," that Yeargin was indeed liable for the sales tax pursuant to section 59–12–103 of the Utah Code and rule 865–19S–58 of the Utah Administrative Code as a purchaser or consumer of personal property. In particular, the Commission found:

> During the course of construction of the facility, ... WECCO entered into an agreement with ... Yeargin, for purpose [sic] of providing assistance in the engineering, design and procurement for the construction of the AP manufacturing facility.... In addition to assisting WECCO, ... Yeargin actually purchased some of the materials which were invoiced and billed to Yeargin and were paid for by checks from Yeargin. Yeargin ultimately installed those materials into the real property at the WECCO facility or consumed the materials in the construction process. The contract provides that title to all materials purchased for use at the WECCO facility would pass directly from suppliers to WECCO, but the invoices and checks indicate that some of the materials came to rest in the hands of Yeargin.

The Commission found paragraph twelve of the parties' stipulation to be ambiguous, and

---

1. The summary of items for which the Division claimed Yeargin owed sales taxes included such items as trench drains and catch basins, pipes and fittings for a fire water system and an underground air system, fire hydrants, concrete, rebar and others, which were used in constructing the AP facility.

2. The stipulation was filed with the Commission in May 1994.

3. The Division also audited and claimed taxes from other entities involved in the construction of the AP facility, including WECCO.

thus received evidence that the parties intended for Yeargin to purchase some materials itself and not just assist in WECCO's purchasing.

¶ 9 The court of appeals concluded that the Commission was not arbitrary or unreasonable in finding that Yeargin, as a real property contractor, had installed or consumed the items for which the tax was due. The court also concluded that there was substantial evidence to support the Commission's finding that Yeargin was the final consumer of the materials and was thus liable for the sales tax pursuant to rule 865–19S–58 of the Utah Administrative Code and section 59–12–103 of the Utah Code. *See Yeargin*, 1999 UT App 094 ¶¶ 15, 21–23, 977 P.2d 527. The court of appeals addressed paragraph twelve of the parties' stipulation in a footnote, finding that it applied only to the transactions in which Yeargin *assisted* WECCO in purchasing materials, not to the transactions "for which Yeargin issued purchase orders, received invoices, and issued checks." *Id.* at n. 7.

¶ 10 Yeargin seeks review of the court of appeals's decision, contending that the court erred in failing to address whether the Commission was bound by the facts agreed to by the parties in the stipulation, and if bound, whether the Commission erred in denying Yeargin's petition for redetermination.

## STANDARD OF REVIEW

¶ 11 "On certiorari, we review the court of appeals'[s] decision for correctness." *County Bd. of Equalization v. Stichting Mayflower Recreational Fonds*, 2000 UT 57, ¶ 9, 6 P.3d 559. The court of appeals's decision is correct only if it accurately reviewed the Commission's decision under the appropriate standard of review. *See Newspaper Agency Corp. v. Auditing Div.*, 938 P.2d 266, 267–68 (Utah 1997). Because the court of appeals was reviewing a formal adjudicative proceeding commenced before the Commis-

sion, the standard of review set out in section 59–1–610 of the Utah Code applies. The court must review the Commission's findings of fact under a "substantial evidence" standard. *See* Utah Code Ann. § 59–1–610(1)(a) (1996). In other words, the court of appeals must uphold those findings of fact that are supported by substantial evidence, or "that quantum and quality of relevant evidence which is adequate to convince a reasonable mind to support a conclusion." *Schmidt v. Utah State Tax Comm'n*, 1999 UT 48, ¶ 7, 980 P.2d 690 (citations omitted). The court of appeals must review the Commission's conclusions of law for correctness. *See* § 59–1–610(1)(b).

## ANALYSIS

### I. JURISDICTION

¶ 12 Before reaching the merits of this review, we address a jurisdictional issue raised by the Division.

¶ 13 The Commission issued its final decision on April 14, 1997. On May 7, 1997, Yeargin filed a petition for review by trial de novo in the third district court pursuant to section 59–1–601 of the Utah Code, which the legislature had amended in 1993 to provide that "beginning July 1, 1994, the district court shall have jurisdiction to review by trial de novo all decisions by the [tax] commission resulting from formal adjudicative proceedings." Utah Code Ann. § 59–1–601(1) (1996).[4]

¶ 14 While the case was pending in district court, we issued our decision in *Evans & Sutherland* in which we held that section 59–1–601 violated article XIII, section 11, of the Utah Constitution because it purported to confer upon the district courts a power expressly reserved in article XIII to the Commission.[5] *See Evans & Sutherland*, 953 P.2d at 436.

---

4. Before the amendment, review could be sought only in this court. *See Evans & Sutherland Computer Corp. v. Utah State Tax Comm'n*, 953 P.2d 435, 437 (Utah 1997).

5. Article XIII was amended in the 1998 general election to provide:

> Notwithstanding the powers granted the State Tax Commission in this Constitution, the Legislature may authorize any court established under Article VIII to adjudicate, review, reconsider, or redetermine any matter decided by the State Tax Commission.

Utah Const. art. XIII, § 11(5). The amendment took effect January 1, 1999. Thus Yeargin's ap-

¶ 15 As a result of this decision, the district court was divested of jurisdiction over Yeargin's petition, and Yeargin therefore filed a petition for review with this court on November 6, 1997. We transferred the case to the court of appeals, which determined that the petition for review, though filed over six months after the filing deadline, was timely "[i]n light of the Supreme Court's treatment of the appellant in *Evans* and the fact that [Yeargin] would be left otherwise without an avenue for appeal in this matter."

¶ 16 The Division contends that the court of appeals improperly granted an "equitable exception" to the jurisdictional filing requirement because Yeargin's petition pending in the district court could have and should have been transferred from the district court to the supreme court pursuant to rule 44 of the Utah Rules of Appellate Procedure [6] and because the contours of the exception are ill-defined and potentially boundless.

¶ 17 Yeargin responds that the court of appeals properly excepted this case based on our decision in *Evans & Sutherland*. We allowed the appellants in that case (and several others pending before us at the time) thirty days from our decision to refile their appeal with this court. *See Evans & Sutherland*, 953 P.2d at 443; *see also Salt Lake City Corp. v. Property Tax Div. of the Utah State Tax Comm'n*, 1999 UT 41, 979 P.2d 346; *Hercules Inc. v. Auditing Div.*, 953 P.2d 445 (Utah 1997). Yeargin contends that because its petition for review was pending in the district court when *Evans & Sutherland* was issued, it was appropriately given the same thirty days to refile its petition with this court.

¶ 18 We agree with Yeargin and hold that the court of appeals appropriately granted Yeargin, a party whose petition for review was pending when we issued our decision in *Evans & Sutherland*, an "equitable exception" to the filing requirement. The Division's contention that we should rely on rule 44 because that rule gives an *appellate court* (i.e., court of appeals or supreme court) the authority to transfer the improperly filed case to the appropriate court lacks merit. Rule 44 does not authorize a district court to transfer a case to an appellate court.[7] Thus, without an equitable exception to the filing requirement, Yeargin, though timely filing a petition for review with a court having jurisdiction at the time the petition was filed, would have been without recourse through no fault of its own. We affirm the court of appeals's jurisdictional determination.

## II. STIPULATION

¶ 19 We now address the legal question of whether the Commission was bound by the parties' stipulation of facts. We have held that "[o]rdinarily, courts are bound by stipulations between parties," and that "parties are bound by their stipulations unless relieved therefrom by the court." *First of Denver Mortgage Investors v. C.N. Zundel & Assocs.*, 600 P.2d 521, 527 (Utah 1979); *see also Higley v. McDonald*, 685 P.2d 496, 499 (Utah 1984) (stating that stipulations conclusive and binding on parties); *Dove v. Cude*, 710 P.2d 170, 171 (Utah 1985) (same).

peal would be proper in the district court under current law, but it fell within the window of time between *Evans & Sutherland* and the amendment.

6. Rule 44 provides:
   If a notice of appeal or a petition for review is filed in a timely manner but is pursued in an appellate court that does not have jurisdiction in the case, the appellate court, either on its own motion or on motion of any party, shall transfer the case, including the record on appeal, all motions and other orders, and a copy of the docket entries, to the court with appellate jurisdiction in the case.

7. The Division asserts that the advisory committee note addressing this rule provides that the authority to transfer a case to the appropriate

appellate court is given to the district courts as well. However, the note states:

> [Rule 44] permit[s] the transfer of an appeal that is timely but improperly filed not only between the Supreme Court and Court of Appeals but also *to* the District Court.... [T]he same policy considerations that permit the transfer of an improperly filed appeal between the Supreme Court and the Court of Appeals should permit the transfer of such a case *to* the District Court.

Utah R.App.P. 44 advisory committee's note (emphasis added). Thus, rule 44 authorizes a transfer to the district court, but does not authorize a transfer from the district court.

Though these cases address the binding effect of stipulations in judicial proceedings, we extend their applicability to stipulations in the context of administrative proceedings. We must now determine whether the stipulation at issue is still in effect, and if so, how it bears on the rights and obligations of the parties.

¶ 20 A stipulation of fact filed with and accepted by a court "acts as an estoppel upon the parties thereto and is conclusive of all matters necessarily included in the stipulation." *Deseret Sav. Bank v. Walker*, 78 Utah 241, 252, 2 P.2d 609 (1931). Such a stipulation "has all the binding effect of findings of fact and conclusions of law made by the court upon the evidence." *United Factors v. T.C. Assocs.*, 21 Utah 2d 351, 354, 445 P.2d 766, 768 (1968). Because the facts stated in a stipulation are conclusive, a stipulation of fact "cannot be met by evidence tending to show that the facts are otherwise." *Deseret Sav. Bank*, 78 Utah at 252, 2 P.2d at 614. Thus, if the stipulation entered into by the parties still stands, the Commission and the parties are bound by it and the Commission cannot receive any evidence that conflicts with the facts contained in it.

¶ 21 Though " '[t]here is an institutional hesitancy to relieve a party from a stipulation negotiated and entered into with the advice of counsel,' " *Rivera v. State Farm Mut. Auto. Ins. Co.*, 2000 UT 36, ¶ 11, 1 P.3d 539 (quoting *Birch v. Birch*, 771 P.2d 1114, 1116 (Utah Ct.App.1989)), a court has the discretion to set aside a stipulation under certain conditions. First, the party seeking relief from the stipulation must request it by motion from the trial court. *See Fullmer v. Blood*, 546 P.2d 606, 608–09 (Utah 1976) (holding that party was bound by stipulation of fact because it did not file motion with trial court requesting to be relieved from it); *Deseret Sav. Bank*, 78 Utah at 252, 2 P.2d 609 (stating that party must seek repudiation through direct proceeding). Second, the motion to repudiate the stipulation must be timely filed. *See Klein v. Klein*, 544 P.2d 472, 476 (Utah 1975). Third, it must show that the stipulation was "entered into *inadvertently* or *for justifiable cause*." *First of Denver*, 600 P.2d at 527 (emphasis added).

Inadvertence cannot be the basis for repudiation when the mistake was " 'due to failure to exercise due diligence, [or if it could] have been avoided by the exercise of ordinary care.' " *Rivera*, 2000 UT 36 at ¶ 11, 1 P.3d at 542 (citation omitted). We have also noted that "[i]t is unlikely that a stipulation signed by counsel and filed with the court was entered into inadvertently." *Dove*, 710 P.2d at 170. Fourth, the lower court must state its basis for relieving the parties of the stipulation. *See id.* ("In the absence of any *articulated* 'justifiable cause,' we must reverse the withdrawal of the stipulation." (emphasis added) (quoting *First of Denver*, 600 P.2d at 527)).

¶ 22 In sum, to determine whether the Commission was bound to accept the facts as stated in the stipulation, and thus decide whether evidence tending to contradict those facts should have been excluded, we must determine whether the Division filed a timely motion requesting relief from the stipulation, and if so, whether the motion was granted based on "articulated 'justifiable cause.' " *Id.*

¶ 23 The Division did not file with the Commission a document entitled "Motion for Relief from Stipulation." However, in its "Memorandum in Opposition to Petitioner's Motion in Limine" (opposition memorandum) the Division asserted that the Commission, in the interest of justice, should relieve the parties from the stipulation because

> At the time of the stipulation, counsel for the parties relied upon the representations of [Yeargin's counsel] in drafting and agreeing to paragraph 12 of the Joint Stipulation. Obviously, subsequent investigation showed the error should anyone interpret paragraph 12 to state that Yeargin Inc. had not purchased materials. To that extent, the Joint Stipulation reflects a mistake of fact.

¶ 24 We conclude that the Division's opposition memorandum, though not entitled such, was in substance a request to be relieved from the stipulation. *See Armstrong Rubber Co. v. Bastian*, 657 P.2d 1346, 1347–48 (Utah 1983) (holding that because pleadings are to be liberally construed, if the

nature of the motion is clear from its substance, an improper caption is not fatal); *Howard v. Howard,* 11 Utah 2d 149, 152, 356 P.2d 275, 276 (Utah 1960) (same). The Division made clear to the Commission its position on the stipulation and implicitly asked the Commission to set it aside. *See Brunetti v. Mascaro,* 854 P.2d 555, 558 (Utah Ct.App. 1993) ("Because the ... documents clearly outlined the parties' respective positions on the question of withdrawal of the admissions, and the trial court was fully briefed thereon, it properly treated the various documents as a motion to withdraw the admissions."). Thus we hold that the Division did file a request to be relieved from the stipulation alleging that it was entered into under a mistake of fact.

¶ 25 However, we find that the Division's request was not timely filed, and thus the stipulation could not be withdrawn and was still in effect.[8] We determined in *Johnson v. Peoples Finance & Thrift Co.,* 2 Utah 2d 246, 272 P.2d 171 (1954), that a motion for relief from a stipulation "must be seasonably made." *Id.* at 250, 272 P.2d at 173. We concluded in that case that a motion to withdraw from a stipulation not made until over nine months after the stipulation was entered into did not entitle the movant to relief from the stipulation as a matter of law. *See id.* We have also found that motions filed five months, *see Dove,* 710 P.2d at 170, and ten months, *see United Factors,* 21 Utah 2d at 354, 445 P.2d at 769, after entering the stipulation did not entitle the movants to relief. We hesitate to relieve parties from a stipulation after such a duration because the longer a stipulation stands, the more likely a party is to have relied on it and the more likely it is that relieving the parties from it might prejudice the nonmoving party. *See id.* at 354–55, 445 P.2d at 769 (citing *Johnson,* 2 Utah 2d at 250, 272 P.2d at 173).

8. Because the request for relief of the stipulation was not timely filed, we need not determine whether there was justifiable cause to grant it.

9. We reject the Division's argument that upholding this stipulation "would have a chilling effect on the purpose of stipulating to facts, and increase the litigation burden on trial courts." The opposite is true. If a court could relieve parties from a stipulation without following procedure,

¶ 26 The stipulation at issue in this case was entered into April 29, 1994, and was filed with the Commission May 5, 1994. On November 16, 1994, the Division received a copy of the construction agreement defining the relationship between Yeargin and WECCO. The Division asserts that it was not until receiving a copy of this agreement that it discovered the "error" in the stipulation. The Division did not file its "motion" to be relieved from the stipulation (opposition memorandum) until December 18, 1996, thirty-two months after the stipulation was entered, and nearly twenty-four months after it claims it was aware of the alleged mistake.

¶ 27 Even were there justifiable cause to release the Division from the binding effect of the stipulation, the motion was so untimely that granting it would severely prejudice Yeargin. Yeargin relied on the stipulation for nearly three years. Bill Burke, in-house counsel for Yeargin from 1988–94, testified at the formal hearing that Yeargin made no attempt to preserve evidence to defend such an action as this because it considered the matter settled by the stipulation. In addition, very few, if any, of the people who had worked on the project still worked for Yeargin and thus could not provide testimonial evidence. We therefore hold that the motion to withdraw from the stipulation was filed untimely and that the stipulation is still binding on the parties and on the Commission.[9]

## III. TAX LIABILITY

¶ 28 Having concluded that the stipulation is binding, we must now determine its effect on Yeargin's liability under the Utah sales tax statute.

¶ 29 Sales tax liability in Utah is governed by section 59–12–103 of the Utah Code, which provides in pertinent part:

parties would be less inclined, not more, to enter into them. Parties would not be able to rely on stipulations they entered into, and they would know that they might later be made to prove the fact previously agreed to, but on shorter notice. A party who enters a stipulation should do so knowing it will be upheld absent a showing of justifiable cause made through the correct procedure.

"There is levied a tax on the purchaser for the amount paid or charged for the ... retail sales of tangible personal property made within the state[, and for] tangible personal property stored, used, or consumed in this state." Utah Code Ann. § 59–12–103(1)(a), – 103(1)(*l*) (1996). Utah Administrative Rule 865–19–58S (1990) [10] was created as a guideline for imposing sales tax on materials and supplies sold specifically to owners, contractors, and repairmen of real property pursuant to sections 59–12–102 and 59–12–103. This rule provides:

A. Sale of tangible personal property to real property contractors and repairmen of real property is generally subject to tax.

1. The person who converts the personal property into real property is the consumer of the personal property since he is the last one to own it as personal property.

2. The contractor or repairman is the consumer of tangible personal property used to improve, alter or repair real property; regardless of the type of contract entered into-whether it is a lump sum, time and material, or a cost-plus contract.

Thus a contractor who is found to be a real property contractor is liable for sales tax on personal property he or she purchases or owns and converts into real property.[11]

¶ 30 We have defined a real property contractor as "one who *purchases* building materials *for use in constructing* homes, highways and the like." *Chicago Bridge & Iron Co. v. State Tax Comm'n*, 839 P.2d 303, 306 (Utah 1992) (emphasis added); *see also Niederhauser Ornamental & Metal Works, Inc. v. Tax Comm'n, Auditing Div.*, 858 P.2d 1034, 1037 (Utah Ct.App.1993) (stating that a real property contractor is a contractor who *purchases and incorporates* materials into real property). Real property contractors are considered ultimate consumers of the personal property because "their purchases of materials that are incorporated into real property are the last transactions in which those materials can be subjected to the sales tax." *Chicago*, 839 P.2d at 306. And "sales tax is levied upon the ultimate consumer." *Tummurru Trades, Inc. v. Utah State Tax Comm'n*, 802 P.2d 715, 718 (Utah 1990).

¶ 31 Thus if Yeargin is a real property contractor, it is a final consumer and is liable for sales tax on the materials it purchased and converted into real property during construction of the AP facility. *See Chicago*, 839 P.2d at 306 ("[A] real property contractor is treated as a consumer for sales tax purposes."). Whether a contractor is a real property contractor for purposes of determining sales tax liability in Utah is a mixed question of law and fact. *See Chicago*, 839 P.2d 303 (Utah 1992) ("[W]hether a taxpayer is a real property contractor or not is a ruling that is based in part on law and in part on fact.").[12] To determine whether

---

10. The 1987–88 version of this rule is numbered 865–58S–19 while the 1990 version is numbered 865–19–58S. However, the substance of the rule is the same.

11. Our decision in *Thorup Bros. Construction, Inc. v. Auditing Division*, 860 P.2d 324, 327 (Utah 1993), makes it clear that a contractor is not a real property contractor and thus liable for sales tax on the purchase of personal property simply by converting personal property into real property. The contractor also must have owned or purchased the personal property. *See Thorup Bros.*, 860 P.2d at 329 ("[W]e conclude that a contractor who has not purchased the materials cannot be the ultimate consumer.").

12. In *Chicago*, we relied on section 63–46b–16 of the Utah Code to conclude that

whether a taxpayer is a real property contractor or not is a ruling that is based in part on law and in part on fact. In ruling on such issues, the Commission must necessarily exercise a degree of discretion, and we accordingly defer to the Commission's determination. We will not upset its ruling unless it is unreasonable or arbitrary.

839 P.2d at 307 (citing § 63–46b–16 (4)(h)(i) (1989)). However, since our decision in *Chicago*, the legislature has enacted section 59–1–610, which explicitly sets forth that in reviewing formal adjudicative proceedings commenced before the Commission, appellate courts will apply a substantial evidence standard to the Commission's findings of fact and will review its conclusions of law for correctness. *See* § 59–1–610. In the instant case, the court of appeals applied the standard of review set forth in *Chicago*, affirming the Commission's findings because they were not unreasonable or arbitrary. *See Yeargin*, 1999 UT App at ¶ 15. Because section 59–1–610(2) provides that it supersedes section 63–46b–16, the court of appeals should have reviewed the Commission's findings under the substantial evidence standard set forth in section 59–1–610.

Yeargin was a real property contractor on the AP project, we must determine whether it was a contractor that (1) converted materials it (2) purchased or owned into real property.

¶ 32 The Commission found that "Yeargin ultimately installed materials [it purchased] into the real property at the WECCO facility or consumed the materials in the construction process." The court of appeals upheld this finding because it was not unreasonable or arbitrary based on the relationship between Yeargin and WECCO as defined in the construction contract. That contract states: "Contractor [Yeargin] shall ... for completion of the Project ... deliver and install permanent materials and equipment." We affirm the court of appeals's conclusion that Yeargin converted material into real property because the construction contract, by providing that Yeargin would install permanent materials, constitutes substantial evidence of that fact.[13]

¶ 33 The next issue we must address, and the one most disputed, is whether Yeargin purchased or owned any of the materials it converted into real property during the construction of the AP facility.

¶ 34 The Commission found that Yeargin purchased some of the materials it installed. In particular, the Commission found:

> During the course of construction of the facility, ... WECCO entered into an agreement with ... Yeargin, for purpose [sic] of providing assistance in the engineering, design and procurement for the construction of the AP manufacturing facility.... *In addition to assisting WECCO, ... Yeargin actually purchased some of the materials which were invoiced and billed to Yeargin and were paid for by checks from Yeargin.*

¶ 35 Yeargin contends that this finding is error because it is based on evidence that conflicts with the plain meaning of the stipulation. According to Yeargin, paragraph twelve of the stipulation "clear[ly] and unambiguous[ly]" shows the parties intended that

WECCO, not Yeargin, purchase, own, and hold title to *all* materials used at the AP facility. Yeargin asserts that because the stipulation is clear, the evidence the Division adduced to show that Yeargin purchased or owned any materials was inadmissible. It contends that because the Commission relied on that evidence, and the court of appeals upheld its finding, the finding must be reversed.

¶ 36 If the evidence supporting the Commission's finding that Yeargin was a purchaser conflicts with the facts as stated in the stipulation, that evidence is inadmissible. *See Deseret Sav. Bank*, 78 Utah at 252, 2 P.2d 609 at 614 (stating that stipulation of facts "cannot be met by evidence tending to show that the facts are otherwise"). If the evidence is inadmissible and it is the only evidence offered to support the finding, the finding is not supported by substantial evidence and is thus erroneous. Whether the evidence conflicts with the facts as stated in the stipulation depends on the interpretation of the stipulation. We must therefore review the interpretation of the stipulation.

¶ 37 The Commission implicitly concluded that the stipulation was ambiguous and thus looked at evidence other than its language to determine the parties' intent in entering into it. It concluded:

> [A]lthough one of the functions of [Yeargin] was to assist WECCO, that does not foreclose the possibility that [Yeargin] may have itself purchased materials for the construction of the facility. [Yeargin]'s interpretation of paragraph 12 is one possible interpretation of the paragraph, but it is not the only possible interpretation.

¶ 38 The court of appeals referred to the stipulation only in a footnote, stating:

> As to those purchases that WECCO made, assisted in whatever way by Yeargin, the Stipulation's provision that title passed directly to WECCO would hold true. However, the Auditing Division presented substantial evidence that Yeargin also made

---

13. We later determine that the construction contract is inadmissible to show that Yeargin purchased or owned materials because such a conclusion conflicts with the parties' stipulation of facts. However, the contract is admissible to show that Yeargin converted or installed those materials into real property because that finding does not conflict with the stipulation.

purchases on its own. We thus read the sentence governing passage of title as being dependent on the sentence immediately preceding it. That is, the provision that title passed directly to WECCO applies only to those transactions in which "[Yeargin] assisted WECCO in purchasing materials for use in the construction of the facility and ... arranged for WECCO to make purchases of materials," and does not apply to those transactions for which Yeargin issued purchase orders, received invoices, and issued checks.

■ ¶ 39 In reviewing the Commission's interpretation of the stipulation, we must determine first whether it correctly concluded that paragraph twelve of the stipulation is ambiguous. Because " '[a] stipulation will be construed like other contracts or written instruments inter partes,'" *Deseret Sav. Bank,* 78 Utah at 251, 2 P.2d at 614 (quoting 20 *Encyc. of Pleading and Practice,* 657–58), whether it is ambiguous is a matter of law, which we review for correctness. *See Willard Pease Oil & Gas Co. v. Pioneer Oil & Gas Co.,* 899 P.2d 766, 770 (Utah 1995). The test in Utah for determining whether a contract (and thus a stipulation) is ambiguous is found in *Ward v. Intermountain Farmers Ass'n,* 907 P.2d 264 (Utah 1995):

> When determining whether a contract is ambiguous, any relevant evidence must be considered.... A judge should therefore consider any credible evidence offered to show the parties' intention.... If after considering such evidence the court determines that the interpretations contended for are reasonably supported by the language of the contract, then extrinsic evidence is admissible to clarify the ambiguous terms.... Conversely, if after considering such evidence, the court determines that the language of the contract is not ambiguous, then the parties' intentions must be determined solely from the language of the contract.

*Id.* at 268. In interpreting a stipulation of fact, the court must determine the intention of the parties at the time of stipulating. *See id.* (stating the court must " 'place itself in the same situation in which the parties found themselves at the time of contracting' "

(quoting *Pacific Gas & Elec. Co. v. G.W. Thomas Drayage & Rigging Co.,* 69 Cal.2d 33, 69 Cal.Rptr. 561, 442 P.2d 641, 645 (1968))). The only evidence relevant to that inquiry is evidence of the facts known to the parties at the time they entered the stipulation.

■ ¶ 40 Under *Ward,* the Commission was correct in considering, to determine whether the stipulation was ambiguous, any relevant evidence adduced to support the parties' conflicting interpretations of it. *See id.* However, the evidence the Commission relied on to determine that the stipulation was ambiguous about Yeargin's status as a purchaser was not sufficient to support its conclusion.

■ ¶ 41 The Commission stated that its findings of fact and conclusions of law were based on the evidence and testimony presented at the final hearing. In particular, the finding that Yeargin was a purchaser of the materials it converted into real property was based on evidence that some of the materials installed into the real property or consumed in the process of construction were invoiced and billed to Yeargin and were paid for by checks from Yeargin. In addition, the Commission relied on the construction contract between the parties.

¶ 42 Because the construction contract had not been made available to the Division at the time the stipulation was entered into, it was not relevant, and thus was inadmissible, in the Commission's determination of the parties' intention at formation of the stipulation.

■ ¶ 43 The only other evidence offered to support the Division's interpretation of the stipulation is the checks and invoices, which were discovered during the audit conducted sometime before the parties entered into the stipulation. Although both parties had access to this evidence at the time the stipulation was entered into, in light of the Division's admission that upon "further investigation" it discovered it had entered the stipulation in error, the checks and invoices are not relevant in determining the parties' intent upon entering into the stipulation and are thus inadmissible in determining wheth-

er the stipulation is ambiguous.[14] In other words, the Division stipulated to the fact that Yeargin was not a purchaser or an owner of materials but then discovered its mistake when it reviewed a copy of the construction contract.

¶ 44 We have determined that the evidence the Commission relied on to determine that paragraph twelve is ambiguous was not admissible. Because the Division submitted no other evidence to support its contention of ambiguity, we conclude that the language of paragraph twelve is not ambiguous. We therefore look to the language of that paragraph to determine whether the parties intended for Yeargin to purchase or own any of the materials used in constructing the facility. *See Ward*, 907 P.2d at 268 ("[I]f after considering [evidence offered to support a particular interpretation], the court determines that the language of the contract is not ambiguous, then the parties' intentions must be determined solely from the language of the contract.").

¶ 45 Again, paragraph twelve reads:

During the course of construction of the facility PPI and WECCO entered into an agreement with United Engineers and Constructors, Inc., and its affiliate, Yeargin, for the purpose of providing assistance in the engineering, design and procurement for the construction of the AP manufacturing facility. United Engineers assisted WECCO in purchasing materials for use in the construction of the facility and located suppliers, obtained price quotations and arranged for WECCO to make purchases of materials. *Title to all materials purchased for use at the WECCO facility passed directly to WECCO from the suppliers.*

(Emphasis added.)

¶ 46 We find the language stating that Yeargin "assisted" in and "arranged" for WECCO to purchase materials for construction of the facility clearly indicates Yeargin's and the Division's intentions that Yeargin not be a purchaser for its own account. In addi-

tion, the final sentence of paragraph twelve, providing that WECCO would take title to *all* materials purchased—not just the materials *it* purchased—unambiguously represents the parties' intent to indicate that WECCO, not Yeargin, owned all materials purchased for the project.

¶ 47 Because the stipulation stands for the fact that Yeargin did not own or purchase any materials for the facility, evidence cannot be admitted to contradict that fact. Thus Yeargin cannot be considered a real property contractor for purposes of sales tax liability.

¶ 48 In its brief, the Division asserts that because Yeargin presented invalid exemption certificates, it is liable for tax under two additional theories: as a vendor or as a retail consumer under the use tax. The court of appeals did not reach these questions, and we remand the case to that court, instructing it to make those determinations.

## CONCLUSION

¶ 49 We hold that the Commission was bound by the facts as stated in the stipulation. Because the language of that stipulation clearly reflects that Yeargin and the Division agreed Yeargin was not a purchaser or owner of materials used in constructing the AP facility, the Commission's determination that Yeargin was a real property contractor was clearly erroneous. We therefore hold that Yeargin was not liable for sales tax as a real property contractor. We remand the case to the court of appeals for further determinations not inconsistent with this opinion.

¶ 50 DURHAM, J., MAUGHAN, and NEHRING, JJ., concur in HOWE'S, C.J. opinion.

¶ 51 Having disqualified themselves, Justice DURRANT and Justice WILKINS do not participate herein; District Judge Paul Maughan and District Judge Ronald E. Nehring sat.

---

**14.** The "further investigation" referred to by the Division was its review of the construction contract, as is evidenced by their statement that "[w]ithout the opportunity to review the contract before entering into the stipulation, neither ordinary care nor due diligence would have discovered the error prior to the date the stipulation was signed."

RUSSON, Associate Chief Justice, concurring in part and dissenting in part:

¶ 52 While I concur in the outcome of this case, I vigorously dissent from that part of the lead opinion that in substance states that regardless of how clear and unambiguous the language of a contract may be, a party may still offer extrinsic evidence ·in an attempt to show ambiguity. This is contrary to well-established canons of contract law that in determining the intent of contracting parties, the court must first examine the plain wording of the document for intent, and looks to extrinsic evidence only if the wording is ambiguous or uncertain. As this court stated in *Winegar v. Froerer Corp.:*

> In interpreting a contract, the intentions of the parties are controlling. If the contract is in writing and the language is not ambiguous, the intention of the parties must be determined from the words of the agreement. A court may only consider extrinsic evidence if, after consideration, the contract language is ambiguous or uncertain.

813 P.2d 104, 108 (Utah 1991).

¶ 53 The lead opinion states clearly in its conclusion that "because the language of the stipulation in question clearly reflects that Yeargin and the Division agreed Yeargin was not a purchaser or owner of materials used in constructing the AP facility, the Commission's determination that Yeargin was a real property contractor was clearly erroneous." In spite of the clarity and unambiguity of the language of the stipulation in question, the lead opinion, strangely enough, states that the Commission was correct in considering extrinsic evidence based upon a test put forth in *Ward v. Intermountain Farmers Ass'n,* 907 P.2d 264 (Utah 1995).[1] We should take this opportunity to reverse that part of *Ward* which allows consideration of extrinsic evidence when a contract is clear and unambiguous because it is contrary to the well-established contract law in Utah and across the country.

¶ 54 The approach wherein a court may consider extrinsic evidence in determining ambiguity, which was adopted in *Ward* and is now further espoused by the lead opinion, "invites parties to create ambiguity in even the clearest contract provisions." *Ward,* 907 P.2d at 270 (Russon, J., concurring). This approach fosters a lack of reliability in the written contract and encourages adjudication. *See id.*

¶ 55 Furthermore, as pointed out in Justice Zimmerman's dissent, *Ward* completely ignored our doctrine of stare decisis. *See id.* at 271 (Zimmerman, C.J., dissenting). Under stare decisis, we must follow the established rule of Utah law unless " 'clearly convinced that the rule was originally erroneous or is no longer sound because of changing conditions and that more good than harm will come by departing from precedent.' " *Id.* (quoting John Hanna, *The Role of Precedent in Judicial Decision,* 2 Vill. L.Rev. 367, 367 (1957)). Needless to say, stare decisis is a cornerstone of American jurisprudence and necessary for the " 'predictability of the law and the fairness of adjudication.' " *State v. Menzies,* 889 P.2d 393, 399 (Utah 1994) (quoting *State v. Thurman,* 846 P.2d 1256, 1269 (Utah 1993)).[2]

¶ 56 In contradiction to our doctrine of stare decisis, *Ward* gave no legitimate reason for overruling long-established Utah precedence. Instead, *Ward* merely mentioned that while Utah case law espouses a stricter application of the rule, the "better-reasoned approach" is to consider extrinsic evidence in determining whether an ambiguity exists.

---

1. Justice Durham wrote the majority opinion, joined by Justice Stewart and Justice Howe. Then Chief Justice Zimmerman and Justice Russon dissented.

2. While we are attempting to overturn *Ward,* which is the current precedent, and stare decisis still applies, a rule established by a case should not be adhered to when it was originally erroneous. *See White v. Deseelhorst,* 879 P.2d 1371, 1378 n. 1 (Utah 1994) (Russon, J., dissenting).

As noted by Justice Felix Frankfurter, " '[S]tare decisis is a principle of policy and not a mechanical formula of adherence to the latest decision, however recent and questionable....' " *Id.* (quoting *Helvering v. Hallock,* 309 U.S. 106, 119, 60 S.Ct. 444, 84 L.Ed. 604 (1940)). In accordance with our doctrine of stare decisis, we have provided sound reasoning as to why *Ward* was clearly erroneous and why more good than harm will come by departing from *Ward.*

*Ward,* 907 P.2d at 268 (relying primarily on California law).

¶ 57 In addition, *Ward* conveniently misconstrued our ruling in *Winegar* that states, "A court may *only* consider extrinsic evidence if, after careful consideration, the contract language is ambiguous or uncertain." 813 P.2d at 108 (emphasis added). Overlooking the constrictive language, *Ward* placed a permissive interpretation on the statement and then applied a converse construction totally lacking in reasoning.

¶ 58 Because *Ward* ignored and misconstrued Utah law, disregarded our doctrine of stare decisis, and contravened the canons of contract law adhered to by most jurisdictions in the United States, it should be overruled. The lead opinion's reliance on *Ward* is therefore misplaced.

¶ 59 In the instant case, the Tax Commission concluded that the stipulation was open to more than one interpretation and looked beyond the language of the stipulation by considering extrinsic evidence such as invoices and checks. Because the determination of ambiguity is a question of law, we review the Commission's decision for correctness.

¶ 60 We cannot speculate as to why parties stipulate to facts. There are innumerable motives as to why a party may stipulate as it did. Therefore, we look to the stipulation itself. If the terms or provisions are conclusive on their face, the intent of the parties is determined solely from the language of the stipulation.

¶ 61 The language of the stipulation before us is clear and unambiguous. It states:

During the course of construction of the facility PPI and WECCO entered into an agreement with United Engineers and Constructors, Inc., and its affiliate, Yeargin, for the purpose of providing assistance in the engineering, design and procurement for the construction of the AP manufacturing facility. United Engineers [Yeargin] assisted WECCO in purchasing materials for use in the construction of the facility and located suppliers, obtained price quotations and arranged for WECCO to make purchases of materials. *Title to*

*all materials purchased for use at the WECCO facility passed directly to WECCO from the suppliers.*

(Emphasis added.) The language of the stipulation states clearly and unambiguously that title for all materials for use at the WECCO facility passed directly to WECCO from the suppliers. The court of appeals erred in upholding the Tax Commission's decision. The stipulation should be enforced as written, and Yeargin does not qualify as a real property contractor. Therefore, I concur only in the result reached by the lead opinion.